(No. 26243.—
ARTHUR JACKSON, Admr., *et al.*, Appellants, *vs.* LAWRENCE K. PILLSBURY *et al.*, Appellees.

*Opinion filed September 21, 1942.*

KINNE, SCOVEL, ROBSON & MURPHY, (HARRY C. KINNE, of counsel,) for appellants.

EARL J. WALKER, for appellee Lawrence K. Pillsbury.

Mr. JUSTICE SMITH delivered the opinion of the court:

A decree of the circuit court of Cook county sustained the validity of a trust agreement and two supplements thereto between George E. Price and Lawrence K. Pillsbury. Plaintiffs, three of the four beneficiaries, prosecute a direct appeal. Defendant Pillsbury, the fourth beneficiary, has appealed separately from portions of the decree deemed adverse to him. A substantial part of the *corpus* of the trust which plaintiffs sought to set aside consists of real estate. The jurisdiction of this court is properly invoked, a freehold being necessarily involved. *Seely* v. *Rowe,* 370 Ill. 336; *French* v. *Calkins,* 252 id. 234.

George E. Price, eighty-six years of age, died April 18, 1938, leaving him surviving as his only heirs-at-law James

M. Price, Cornelius C. Price and Mary Price Gaston, children of his deceased brother, James S. Price. During his younger days Price had been an employee of the building department of the city of Chicago, but retired some years prior to his death. June 10, 1926, Price was declared insane in the county court of Cook county. On July 6, 1927, an order was entered in the same court restoring him to civil rights. August 11, 1927, Price, then seventy-five years of age, was again adjudged insane in the county court because of "chronic alcoholism and senile dementia." His daughter, Melinda Price McNeil, was on August 16, 1927, appointed conservatrix of his estate, and so acted until her death on January 19, 1933. Upon the death of his daughter intestate Price became sole heir to all her property, which included all the property, real and personal, she had taken as sole beneficiary under the last will and testament of her deceased husband, Malcolm Gordon McNeil. Among the assets of her estate was the Glenora farm located in Kane county, near Elgin. During Melinda's lifetime, Price spent much of his time at the farm, alternating between there and the Eastgate hotel in Chicago. February 2, 1933, an order was entered by the county court finding Price sane and restoring him to civil rights. On the same day, a petition for letters of administration in the estate of Melinda Price McNeil, deceased, was filed by Price in the probate court of Cook county seeking the appointment of defendant Pillsbury, as administrator of her estate. Letters of administration were issued to Pillsbury February 2, 1933, and he acted as administrator until the estate was closed July 30, 1936. As acting conservator of the estate of George E. Price, incompetent, a position he assumed upon appointment as administrator of Melinda's estate, Pillsbury filed his final account on May 27, 1935. In the interim, on August 4, 1933, Price petitioned the probate court for the appointment of Pillsbury, as administrator with the will annexed *de bonis non* of the estate of Malcolm Gordon

McNeil, deceased. Letters were granted to Pillsbury on August 7, 1933, and final account therein was filed by defendant August 4, 1934.

On September 8, 1933, a trust agreement was entered into by and between Price, as donor, and Pillsbury, as trustee. By its terms this instrument gave Pillsbury, as trustee, power to administer Price's property and affairs during the donor's lifetime, provided, however, that the trustee should have no power to sell or lease any of the real estate without the donor's consent. Price was to have the entire net income during his lifetime and at his death a parcel of property located on Wabash avenue, Chicago, was to go to Pillsbury and the remainder was to be divided among Price's three heirs-at-law, Josephine Quinn and Pillsbury. The trust agreement provided that it could not be changed without the written consent of Pillsbury. This agreement was witnessed by attorneys Albert R. Kasuls and Charles E. Green. On December 24, 1935, and, again, on June 14, 1937, supplemental agreements were entered into by and between Price and Pillsbury, the first of which eliminated Josephine Quinn as a beneficiary of the original trust agreement. The supplement of December 24, 1935, was witnessed by LeRoy Mote and Morrison Waud, and that of June 14, 1937, by Erwin W. Roemer and Morrison Waud.

Upon the death of Price, letters of administration were issued to Arthur Jackson, May 2, 1938. A conflict soon arose as to the right to possession and ownership of items constituting Price's estate, namely, whether title to the property had been conveyed to Pillsbury, as trustee, under the trust agreement, or whether the real estate descended to Price's heirs-at-law and the personalty as intestate property, to Arthur Jackson, as administrator. This conflict culminated in the filing, on August 19, 1938, in the circuit court of Cook county, by Jackson, as administrator, James M. Price, Cornelius C. Price and Mary Price Gaston, of

their complaint against Pillsbury, and others. The three heirs-at-law will be referred to as plaintiffs, and Pillsbury as defendant. By their complaint, plaintiffs alleged that the trust agreement was void; that Price was an habitual drunkard and incapable of transacting any business; that prior to his daughter's death and until his own death, Pillsbury, by supplying him with intoxicating liquor, procured his signature upon various checks and other papers to obtain control of his cash resources. The complaint further charged that, at all times, Pillsbury occupied a fiduciary relationship toward Price; that he caused the trust agreement to be made irrevocable without his (Pillsbury's) written consent, and himself to be named beneficiary of a large portion of Price's property, and that, subsequently, he induced Price to execute the two supplemental trust agreements, the first eliminating Josephine Quinn as a beneficiary. It is also alleged that defendant foreclosed a certain mortgage belonging to Price and caused a master's deed thereto to be issued in his own name, individually, which he pretended to own, and that he had taken possession of the farm in Kane county and claimed title thereto. The relief sought was that the trust agreement and the supplements be declared void and cancelled; that plaintiffs be adjudged the owners as tenants in common in fee simple, of all the real estate owned by Price and that Jackson, as administrator, be adjudged entitled to possession of all of the personal property belonging to Price; that Pillsbury be decreed to have no interest in and to any of the real or personal property belonging to Price; that defendant be enjoined from disposing of or encumbering any of the personal property belonging to the estate, from collecting any rents, issues and profits of the real estate owned by Price, and from interfering with its management; that a receiver be appointed to take possession of the property and collect the income therefrom, and that defendant be ordered to convey and deliver to the receiver all of the personal property

under his control and formerly belonging to Price. An accounting was also asked. An injunction was entered, with the approval of defendant's attorneys, restraining defendant from transferring or encumbering any of the property formerly belonging to Price. Defendant's answer denied the material allegations of complaint and averred that since his daughter's death Price was at all times normal, of sound mind, and able to transact his business affairs; that he, defendant, had lawful possession and control of Price's property by virtue of the trust agreement; that Price consulted with a reputable attorney (who was not defendant's attorney) to prepare the agreement and that it was freely and voluntarily executed, and that he, defendant, had faithfully performed his duties as trustee. Defendant admitted foreclosing a mortgage and taking title to the property securing it, namely, property on Artesian avenue, in his own name upon the advice of the master in chancery who conveyed the title to him, but averred that he held title under the trust agreement. Defendant also answered that he had known Price, Melinda and her husband for twenty years, had visited them in their respective homes, had rendered unusual services to Price, and that plaintiffs, on the other hand, were not on intimate terms with their uncle and did not visit him. The cause was referred to a master in chancery to take and report the testimony as to whether (1) the trust agreement and supplements thereto were Price's voluntary acts and deeds; (2) Price had sufficient mental capacity to execute them; (3) he was induced to sign them by defendant; (4) Price ever thereby conveyed any real estate to defendant; (5) Price ever assigned or delivered any personal property thereunder to defendant, and (6) defendant ever acted as trustee under the agreements. While the case was pending before the master, Pillsbury filed a counterclaim asking a construction of the trust agreement. A supplemental counterclaim filed by defendant made William Connery

and Maurice Van Thournout additional parties to the action and sought to have a lease by himself, as trustee, to Connery, demising the Kane county farm, declared valid, and to have a lease to the same property by plaintiffs to Van Thournout set aside. Also, while the case was pending before the master, a receiver was appointed over the real and personal property involved in this litigation. The master found the six issues propounded to him in favor of defendant, and the chancellor confirmed the master's report and entered a decree in accordance with its recommendations. The decree, so far as relevant, ordered (1) the real estate in the trust transferred, share and share alike, among the three plaintiffs and defendant, and (2) an accounting by defendant of all his acts as trustee. The decree denied defendant the relief sought by his counterclaims. Jurisdiction over the accounting was reserved.

To show that Price had sufficient mental capacity to execute the agreements, defendant introduced the testimony of numerous acquaintances of long-standing of Price. Frank A. Gaynor, in charge of the department of elevator inspection for the city of Chicago, where Price was employed for more than twenty years until his retirement in 1919, had known Price for forty-four years. He expressed the opinion that Price, at all times, was very intelligent, possessed a marvelous memory, including the years 1933, 1935 and 1937; that in those years he had sufficient mind and memory to exercise his will and transact business where his interests were concerned, and that he was at no time insane. Gaynor stated that Price did take a drink "at times" outside of business hours, that he was not a heavy drinker, and that he reported for work the next day. Kathryn Day, wife of the superintendent of mails in the Chicago post-office, became acquainted with Melinda McNeil in 1928 and visited her frequently thereafter in Chicago and at the Glenora farm. She first became acquainted with Price in 1926 or 1927. After the death of Mrs.

McNeil, in 1933, Price arranged with Mrs. Day and her husband to live at the farm where the former was to manage the household. They remained on the farm a year and five months. Mrs. Day testified that upon Melinda's death Price announced he was going to see if Larry Pillsbury would come out and look after his business; that many times she had observed defendant performing errands for Price, taking him back and forth from the farm to the Yacht Club, or to his hotel, to see the doctor, and bringing him home from any place Price desired to visit, and that, in rendering these services, defendant used his own automobile. The witness recounted, in detail, the activities of Price while staying at the farm, observing that he was always alert; that he supervised the quality of materials put in the house after a hurricane in 1933; that he drank at night before his dinner and when he went to bed,—a spoonful or two; that his health was very good, his mind active; that he read a great deal, had a wonderful memory, and that he was normal mentally. From transactions with him and, particularly, in 1933, Mrs. Day stated her opinion that Price was capable of transacting business affairs where his interests were involved and knew the effect of his acts; that he knew his property; that he was sane, and had ability and mentality to exercise his will.

Earl F. Hopkins, manager of the Eastgate hotel where Price resided in the winter months, became acquainted with him in October, 1932, and saw him at the hotel and, frequently, at the farm. He testified that Price was very particular about his requirements at the hotel, especially the prices charged him for various items and meals; that he never saw Price intoxicated; that he was sane in 1933 and knew the effect of his acts and could exercise his will. He also said that Pillsbury was often present, performing services for Price and making him comfortable, frequently staying week-ends at the hotel with Price when he was in poor health. Dorothy Lang was housekeeper at the hotel where she became acquainted with Price in 1931. Accord-

ing to her, Price was keen and bright, and could exercise his will and manage his affairs. She declared that she never saw Price intoxicated and that she knew he was sane.

Wallace R. McNaughton, field manager for a large drug company, who lived at the hotel, testified he had known Price since 1930 and visited him at the farm; that Price drank but he, McNaughton, never saw him drunk; that he was familiar with current events at all times and his mind very keen, and that he was able to transact business affairs and exercise his will. From McNaughton's testimony it appears that Price told him that Pillsbury was managing his business affairs, and that he observed Pillsbury looking after Price and taking care of him. Rudolph Miller, sales-manager for Fitzpatrick Brothers, resided at the hotel and knew Price about 1930, and saw him frequently. Miller testified to numerous conversations with Price, to his excellent mental and physical condition and memory during those years; that he was not insane; that he could transact business affairs, and that Price drank occasionally with him but was never drunk.

Emanuel Doetsch, a seed and flower dealer, sold shrubs, bulbs and other supplies to Price and Pillsbury in 1932, and thereafter. This witness testified that in paying for these items Price stated Pillsbury was managing the farm and was his trustee. Doetsch was of the opinion that Price was competent mentally in 1932, and later. Similar testimony was given by Bernard H. Hoss, who, with his father, had negotiated for the purchase of spring water at the farm to be sold commercially, and by Walter W. L. Meyer, an attorney and assistant to the probate judge who handled the closing of the estate of Melinda McNeil and the conservator estate of Price. Meyer also visited the farm and testified to services of Pillsbury there and elsewhere and to Price's unusual mental ability.

Dr. George L. Perusse who began treating Price professionally in September, 1932, saw him about fifty times. He testified that Price never suffered from alcoholism, and

that he treated Price for the usual ailments for one of Price's advanced years. Dr. Perusse expressed the opinion that Price was sane in 1933 and on later dates. Dr. Arthur H. Conley who made the psychopathic and physical examination for the county court at the time of the restoration proceedings in 1933, testified he saw Price frequently thereafter at the farm, and elsewhere; that there was no chronic alcoholism, no dementia praecox; that he never saw Price drunk although he had prescribed alcohol occasionally for him; that his mentality was sufficient for the transaction of business and the handling of his affairs at all times, and that he had no indication of senile dementia.

Thomas P. O'Brien of the Chicago Title and Trust Company, Charles H. Bainbridge, dry-goods man residing at the Eastgate hotel, Thomas Tiffany, building contractor near Elgin, who repaired the farm buildings after the hurricane in July, 1933, and Charles Sedgwick, trust officer of the Continental Illinois National Bank and Trust Company, testified to the effect that Price was sane and competent to take care of ordinary business transactions.

The trust agreement of September 8, 1933, and the two amendments, were prepared by Erwin W. Roemer, a well-known attorney in Chicago. Roemer testified that he became acquainted with Price in the latter part of January or early part of February, 1933, through a patent attorney, and that he met Pillsbury at the same time. At this meeting Price retained Roemer to represent him in the county and probate courts to obtain his restoration to civil rights. Before these proceedings, Roemer had Price examined by Dr. Conley, Roemer's family physician. Roemer testified concerning his preparation of the trust agreement of September 8, 1933, at Price's request and, also, under the directions given to him by Price that he should take up the matter with Pillsbury, and "tell him exactly what his wishes were in this matter and that he was very anxious to have Larry handle his property and this trust and to agree to

carry out the trust." Attorney Roemer narrated a conversation between Hon. John F. O'Connell, judge of the probate court, and Price in April, 1933, when an order was entered restoring to Price control of his property. Judge O'Connell told Price he was satisfied that he, Price, was mentally competent and entitled to be restored to the control of his property and to carry on alone, but suggested, as friendly advice, that he consult some close friend about handling his property so he could enjoy it the rest of his life. Price replied that he had in mind a very close friend of himself and his daughter whom he would request to handle his property. Price called at the office of Roemer in September, mentioned his friendship for Pillsbury, and stated that the latter had been a fine companion and had rendered many valuable services to him and his daughter. He said he wanted to have "Larry" handle his property and he told Roemer the provisions he desired to incorporate in the trust agreement. Price gave to his attorney a resumé concerning his family affairs, saying that the only relatives he would remember in his trust agreement were the children of Florence Price (plaintiffs here); that he had been lonesome and that his relatives, apart from his daughter, had ignored him and that there were only two persons left who had been actively interested in him for several years, one of them being Larry Pillsbury and the other Josephine Quinn; that he liked the companionship which they gave; that they took their time for such purpose and that he wanted them named in the agreement, giving the proportions of their interests. Roemer detailed the circumstances relating to the various provisions in the trust and the frequent conferences between himself and Price as to the terms suggested by the latter when Pillsbury was not present. The witness said that at no time was Price under the influence of intoxicating liquor; that his answers were intelligent and responsive; that he knew the items of his property and their nature, including the

properties in the trust estate of Cornelius Price which he shared. Price directed Roemer to acquaint Pillsbury with the contents of the trust agreement. Roemer conferred with Pillsbury, as directed, and asked the latter to sign the agreement to render it binding, Price having previously signed. Later, Pillsbury and Price were in Roemer's office together and the attorney read and discussed the agreement with them. Roemer testified that he delivered the original trust agreement to Pillsbury when the latter signed it and assented thereto, and that he told the latter he would be expected to keep it. Pillsbury replied that as long as Roemer would probably advise him on the agreement from time to time, he would leave it with the attorney for such purpose. Roemer testified he then directed Price to deliver stocks and other items of personal property to Pillsbury, who would in the future manage the trust. Price said he would do so, and certain stock certificates were turned over to Pillsbury in the attorney's presence. Roemer also testified that Price was mentally competent to transact business; that at the time of the execution of the trust agreement he was entirely sober, and that defendant Pillsbury did not participate in the execution of the deeds.

The testimony of the attesting witnesses to the signature of Price on September 8, 1933, corroborated Roemer. The latter's testimony discloses that substantially the same facts and circumstances transpired at the time of the execution of the first modification of the trust agreement on December 24, 1935. The supplement of June 14, 1937, was executed under similar circumstances. In each case the written consent of Pillsbury was obtained.

Testimony in behalf of plaintiffs, so far as pertinent, requires recounting. Josephine Quinn Glenn, originally a beneficiary under the trust agreement, now a resident of LaSalle, Colorado, testified by deposition that she met Price in 1932 at the Eastgate hotel where she then lived and that she was a visitor in Price's home at Elgin almost

every week-end. According to this witness, defendant controlled Price's actions; defendant was unkind to Price; defendant kept liquor at the farm for Price; Price drank excessively; by six o'clock in the evening Price would be in a stupor as a result of drinking whereupon defendant would bring papers and checks for him to sign; Price was afraid of defendant, who threatened he would put Price in an insane asylum, and Price often told her he wanted to rid himself of defendant. On cross-interrogatories, Mrs. Glenn testified further that Price drank with his guests, observing: "He was a bright man when he wasn't under the influence of liquor. He understood what was going on only when he wasn't under the influence of liquor." Anent her testimony stating that Pillsbury threatened to have Price put into an insane asylum, the witness added: "He wasn't insane, but he threatened him because he had been there before. He threatened he would put him back there. His mind was clear except when he was drinking." She blamed defendant for eliminating her as a beneficiary of the trust. James B. Bojack had known Price since 1906, made numerous trips with him, and visited him about once a month after Melinda's death at both the Eastgate hotel and the farm. Bojack testified that during the summer of 1933 on an occasion when defendant was trying to dissuade Price from seeing Josephine Quinn, and, again, in 1934, in the presence of witness' wife, defendant stated: "If the old fool don't quit his girls I will put him back in the insane asylum." The witness said that Price loved liquor and was under the influence of liquor each visit—sometimes in a helpless condition. Bojack stated that in a conversation late in 1934 at witness's home Price declared he was dissatisfied, did not like the way things were being done, saying he "did not own himself," "was being watched all the time," "could not do what he wanted to do," and asked the witness if he would act as trustee. Bojack testified further that in the summer of 1933 he had a conver-

568

sation with Price about a will; that Price asked him to witness a will in attorney Roemer's office, and that he accompanied Price, as requested, but that the will did not materialize. Although it appears that Bojack would have acted as a witness to Price's will had one been executed, he expressed the opinion that Price was unable to transact the ordinary affairs of life after Melinda's death, and lacked ability to take care of his own business. William Pessler, a caretaker on the farm, testified that defendant, in April or May, 1933, and numerous times thereafter, told him Price was crazy and that if he did not behave himself he would have him sent to an asylum; that, in 1934, Price told him he did not want defendant as a trustee but did want Bojack; that defendant sometimes brought a case of liquor to the farm and that Price always drank it; that during the week Price did not drink much, but over the week ends, "he always was drunk;" that defendant urged Price to drink, and that he, Pessler, saw Price drunk a hundred times. On cross-examination, the witness stated it was impossible to cheat Price out of a nickel; that he was "pretty smart" about money, "he knowed everything," and handled loan transactions, including a loan to him, on a business basis. Pessler also testified as to an incident on October 5 or 6, 1932, when Price chased his daughter out of the kitchen with a nine-inch steel hunting knife. Pessler's wife corroborated the testimony of her husband as to Price chasing Melinda with a knife, saying, "I kill her." She testified that she saw Price drunk fifty to one hundred times after defendant came to the farm but never saw him drunk during Linda's lifetime; that about three months after Melinda's death and, also, in the fall of 1934, defendant told her Price was not right in his head, "nuts," and that he would put him back in the asylum. Mrs. Pessler expressed the opinion Price could not take care of his own business during the year 1933 before or after Melinda died. Louise Zindt and her husband, Louis, were long acquainted

with Price and his daughter, and were visitors at the farm from time to time. Mrs. Zindt testified she saw Price drunk November 8, 1935, at a birthday party at the farm. In the opinion of Mrs. Zindt, based upon her long acquaintance with him, Price was absolutely not able to transact the ordinary business affairs of life. Louis Zindt declared that from his knowledge of Price and his acquaintance with him over a period of twenty-five years, Price was not able to transact the ordinary affairs of life. Zindt testified that in the summer of 1932 and in the fall of 1933 he had talks with Price about acting as his trustee, Price saying he was dissatisfied with defendant who had threatened several times to have him declared insane again. William J. Stange testified that defendant was on a commission basis with his company, engaged in the chemicals and dyes business, and that he earned very good commissions. Walter A. Hagen, engaged in the real estate investment business, testified that he had known Price about twenty years and had sold him three or four mortgages before his daughter was appointed his conservatrix; that "in the earlier years I would say he was able to transact the ordinary business affairs of life. I would say up to ten years ago," but that in 1933 he was not able to transact the ordinary business affairs of life. He admitted, however, Price had made an investment with him in 1931. Charles H. McNeil, a brother of Gordon McNeil, deceased, engaged in the automobile business in Detroit, Michigan, testified that he had seen Price intoxicated about a dozen times at the farm, at the Eastgate hotel, and in witness's office, and that in February, 1935, defendant told him that Price was "crazy as a mule," also stating, "I have threatened him several times if he don't behave himself I was going to put him away." McNeil testified that at no time was Price capable of handling his own affairs.

Lottie Stoddard, a resident of the Eastgate hotel, testified that she met Price at the hotel in 1931, saw him prac-

tically every day when he was at the hotel and visited him at the farm on several occasions; that she saw him intoxicated out at the farm only on one occasion; that she saw Price intoxicated an average of once a week at the hotel; that she had seen defendant bring liquor into Price's room about four times; that one night in the latter part of 1936 Price called her up to his room in the hotel, exhibited a small rusty revolver and said he was going to shoot Pillsbury because he was not fair to his daughter, and that Price expressed great fear of going back to the insane asylum, saying that defendant had threatened to commit him. The witness was of the opinion that Price was unable to transact the ordinary business affairs of life.

Mrs. James M. Price testified that during nearly five years she had known Price she saw him six or seven times a year and expressed her opinion he was not able to transact the ordinary business affairs of life.

Plaintiffs insist, that, as a question of fact, the creation of the trust agreement dated September 8, 1933, as amended December 24, 1935, and June 14, 1937, was not the free and voluntary act and deed of George E. Price but, instead, that he was induced to sign and execute it by defendant Pillsbury; that a triple fiduciary relationship obtained between defendant, as trustee, and Price, *cestui que trust,* and that this alleged triple fiduciary relationship arises from the fact that defendant was, on September 8, 1933, acting as administrator of the estates of Melinda McNeil, deceased, Gordon McNeil, deceased, and as conservator of the estate of George E. Price, in all of which estates Price was the sole beneficiary. Plaintiffs contend that where a fiduciary relationship exists the burden rests upon the beneficiary of an instrument executed during the existence of the relationship to show the fairness of the transaction, that it was equitable and just, and that it did not proceed from undue influence. (*Kosakowski* v. *Bagdon,* 369 Ill. 252; *Suchy* v. *Hajicek,* 364 id. 502; *Com-*

*mercial Merchants National Bank and Trust Co.* v. *Kloth,*
360 id. 294.) Where it appears that relations of trust and
confidence obtain between parties to transactions, the domi-
nant party, who has profited thereby, must rebut the pre-
sumption of fraud by clear and convincing proof that he has
exercised good faith and that he has not betrayed the con-
fidence reposed in him. (*Dowie* v. *Driscoll,* 203 Ill. 480.)
On the other hand, it is equally well established that the
mere existence of a fiduciary relation does not invalidate
a transaction between the parties where the evidence dis-
closes (1) that the grantor had competent and independent
advice of an attorney, or, (2) the deed was not procured
through improper means attended with circumstances of
oppression or overreaching. (*Masterson* v. *Wall,* 365 Ill.
102; *Negley* v. *Ingleman,* 335 id. 52; *Zeigler* v. *Illinois
Trust and Savings Bank,* 245 id. 180; *Uhlich* v. *Muhlke,*
61 id. 499.) This rule applies even though the relation of
conservator, guardian or administrator exists between the
grantor and the trustee. (*Pillsbury* v. *Bruns,* 301 Ill. 578;
*Lang* v. *Lang,* 284 id. 148.) Recourse to the evidence dis-
closes that the agreement dated September 8, 1933, was
prepared shortly prior to the day named by Erwin W.
Roemer, a highly reputable ·member of the Chicago bar,
who represented Price from February, 1933, to the time of
his death in 1938. The challenged agreements were drafted
pursuant to Price's instructions. Conversely, the record is
barren of testimony even intimating that the suggestion
for the execution of deeds to a trustee came from Pillsbury.
Each was prepared out of Pillsbury's presence and without
his advice. It must be remembered that the judge of the
probate court of Cook county who entered the restoration
order suggested to Price at the hearing that he consult
some close friend with respect to the management and con-
servation of his property, and that, on this occasion, Price
advised the court he then had a very close friend in mind
for this purpose. Although the evidence demonstrates that

Price was addicted to strong drink, it is likewise clear that he was not only competent to transact business transactions but that he was at least fairly alert in protecting his own interests at each of the times in controversy. When the several trust agreements were executed Price was a widower, without descendants, and he was not on intimate terms with his collateral relatives, including plaintiffs. Indeed, it may be observed that his collateral relatives had, so far as the record discloses, never evinced the degree of courtesy and attention to their aged uncle accorded him by defendant. When all the facts and circumstances are considered, it is but natural that Price should desire to give a portion of his considerable estate to his close friend and confidant. Plaintiffs impute ulterior motives to Pillsbury's connection with each and every kindness rendered Price, and it is argued, accordingly, that the provision made by Price for Pillsbury was not the former's voluntary act. It suffices to observe that when Pillsbury first met Price he was employed, held a responsible commercial position and was earning an income ample to supply his wants. The inference that Pillsbury's motives were wholly ulterior is simply not warranted by the evidence. Testimony of the attesting witnesses to Price's signature on the trust agreement of September 8, 1933, sustains our conclusion that the agreement was Price's free and voluntary act. Similarly, the facts and circumstances attending the execution of the first modification of the trust agreement on December 24, 1935, discloses that the modification was prepared by attorney Roemer, Price's attorney, who received explicit directions so to do from his client. Again, the amendatory agreement of June 14, 1937, was prepared by Roemer at the request of his client, who decided on another change in the trust agreement. Price knew precisely what changes he desired to accomplish and explained in some detail his wishes with respect thereto. Even if it be conceded that a fiduciary relationship existed between Price and defendant

Pillsbury, the evidence establishes that Price had competent and disinterested advice, namely, the advice of attorney Roemer and, secondly, that he entered into the several transactions of his own free will and accord, knowing their nature and effect, and without any duress, fraud or undue influence being perpetrated upon him. The requirements of the law were satisfied.

The second question requiring consideration is whether Price, at the time of the execution of the respective agreements, had sufficient mental capacity to execute them. Plaintiffs invoke the familiar rule that the test of mental capacity necessary to enable the grantor to make a valid deed is that he be capable of understanding, in a reasonable manner, the nature and effect of the act in which he is engaged. (*Ring* v. *Lawless,* 190 Ill. 520.) Mental strength to compete with an antagonist and understanding to protect his own interest are essential in the transaction of ordinary business. (*Thatcher* v. *Kramer,* 347 Ill. 601.) Plaintiffs argue that Price was incapable, in contemplation of law, of transacting ordinary business affairs and, in particular, the execution of the trust agreements assailed. The evidence recounted shows a large number of witnesses testified to the effect that Price was thoroughly capable of transacting business at and about the time of the execution of the agreements. The opinions expressed were predicated upon the experience of the several witnesses with Price, tending to afford them a reasonable opportunity of observing his mental capacity. It is true that a number of witnesses testified to the contrary. Of these, four were parties in interest who rarely saw or had dealings of any kind with Price, and several were definitely hostile to defendant. The evidence is uncontroverted that Price was not intoxicated when the instruments in controversy were signed by him. The Supreme Court of the United States in *Ralston* v. *Turpin,* 129 U. S. 663, considering an analogous situation involving the execution of a deed by a grantor

to children of his conservator pertinently observed: "He was often intoxicated, and, when in that condition, was incapacitated to transact business. * * * His capacity, when sober, to transact business is abundantly shown. The vital inquiry is as to his capacity, not when he was intoxicated, but when the deeds were executed. [Citation.] The evidence leaves no room to doubt that, at those particular dates he fully comprehended the character of those instruments." *Harrington* v. *Travis*, 349 Ill. 606, is to the same effect. At the time of the execution of the agreements Price had been restored to his property rights by orders of the county and probate courts of Cook county reciting that he was mentally competent to manage, care for and deal with his property in a rational manner. The evidence sustains the master's conclusion, confirmed by the chancellor, that Price had sufficient mental capacity to execute the three trust agreements.

Plaintiffs having apparently waived their complaint to the sufficiency of the trust deed as a conveyance of real estate, we deem it sufficient to observe the instrument of September 8, 1933, recites that Price "has transferred, conveyed and assigned, and does hereby transfer, convey, assign and set over to the trustee all and singular the property of the donor of whatsoever kind and character, and wheresoever located, the receipt of which in trust and upon the terms and conditions hereof is hereby acknowledged by said trustee. The trustee hereunder shall have full power * * * to sell * * * any property, real or personal." Unquestionably, Price conveyed his real property to the defendant as trustee.

The next question presented is whether Price ever assigned or delivered any personal property under the trust agreement of September 8, 1933, to defendant Pillsbury, as trustee. The recital of the trust agreement last quoted applies to the personal property as well as real estate. Furthermore, the trustee was specifically authorized to sell

the personal property and all securities held in trust. The trust agreement was signed by Price and, also, by defendant. From attorney Roemer's testimony it appears that securities were actually delivered by Price to defendant at Roemer's law office, and all stocks and bonds shown by exhibits introduced by plaintiffs, were deposited in a bank in the account of defendant, as trustee. It also appears that a large number of checks was introduced in evidence representing payments made by the trustee of the estate of Cornelius Price, brother of George E. Price, and these checks were endorsed over to defendant, as trustee, and placed in the trust account. The issue referred to the master for decision was the determination of whether "any" property was delivered to the trustee. The evidence abundantly sustains the master's finding, confirmed by the chancellor, that Price did assign and deliver personal property under the trust agreement.

The last question referred to the master was whether the defendant ever acted as trustee under the three agreements. The original trust deed executed in 1933 required the trustee's approval in the event of changes. This approval was given to the changes subsequently made in the trust agreement. Competent testimony discloses that Pillsbury, as trustee, executed leases of the Glenora farm, in Kane county, and water rights thereon over a period of years while Price was still alive. He also executed checks and agreements involving various matters as Price's trustee subsequent to his appointment in 1933. The testimony warranted the master's finding that Pillsbury transacted considerable business matters, as trustee, after September 8, 1933.

Next, plaintiffs strenuously insist that communications between Price and his attorney, Roemer, were privileged communications and that, consequently, Roemer was not competent to testify over objection by plaintiffs in the absence of the consent of the administrator of Price's estate. According to the testimony of attorney Roemer, Price, in

September, 1933, consulted with him with respect to the preparation of the trust deed and instructed him to communicate with defendant and inform him of the matters to be incorporated in the deed and obtain the latter's consent thereto. Shortly after the deed was signed by Price, Roemer had a conference with defendant telling him of the directions given him by Price for the preparation of the trust deed and his purpose in executing it. Roemer testified further that subsequent to the signing of the trust deed Price and defendant were at his office together and conferred with him about the terms of the agreement. Similar testimony is in the record with respect to the amendatory trusts and deeds executed in 1935 and in 1937. The circumstances of each case determine whether communications between an attorney and a third person are privileged, (*Dickerson* v. *Dickerson,* 322 Ill. 492,) but in any case they must have been confidentially made and the confidence must have been essential to the satisfactory maintenance of the relation, and the resultant injury to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of the litigation. Furthermore, the rule with respect to confidential communications does not apply to attesting witnesses.

Nevertheless if Roemer's testimony as to the communications between him and Price should be held to be incompetent no different result could be reached. The most rigid rules as to the testimony of an attorney concerning privileged communications between attorney and client, would not prevent Roemer from testifying that he acted solely on Price's behalf in preparing the instruments and did not consult Pillsbury as to what such instruments should contain; that the instruments were prepared according to the directions given him by Price, and not by Pillsbury; that so far as Roemer knew, they embodied Price's ideas and not those of Pillsbury. If the balance of the testimony

of Roemer be wholly disregarded, under all the other evidence in the case no different result would be justified.

Plaintiffs also insist that the trust agreement of September 8, 1933, was never delivered during Price's lifetime. Attorney Roemer stated that he delivered the deeds to defendant, as trustee, and that, on each occasion, after acquiring possession of the instrument defendant executed the binding consent required by the deed. Later, defendant requested Roemer to keep the instruments for him, the trustee, and Roemer consented so to do. Their subsequent retention by Roemer at Pillsbury's request did not affect the matter of delivery. A legal presumption obtains in favor of delivery and the burden of proof ɪests on the grantor and those claiming through him to show an absence of delivery. Manual delivery is unnecessary. (*Crow* v. *Crow*, 348 Ill. 241.) Where a binding agreement is signed by the parties, as in the present case, it is of but little legal significance. Here, defendant had accepted in writing the terms and provisions of the deeds made to him as trustee. This was a sufficient delivery. *Meldahl* v. *Wallace*, 270 Ill. 220; *Dickerson* v. *Dickerson, supra.*

Plaintiffs maintain that the orders of the county court and the probate court of February 2, 1933, and April 5, 1933, respectively, restoring Price to his civil rights were void as to defendant because no notice was given to anyone of the proceedings. A certified transcript of the order of the probate court restoring Price to the management of his property discloses all jurisdictional prerequisites are set forth, and the order specifically recites that notice of application for restoration had been duly served upon the conservator of the estate; that a jury was called to try the issue presented for decision and concludes that the jurors returned a verdict that Price "is restored to reason, and is capable of managing and controlling his estate," and that upon the verdict of the jurors "It is ordered by the court that George E. Price has become restored to rea-

son, and is now capable of managing and controlling his estate and freed from all disability incurred by the verdict of the jury heretofore rendered declaring him to be an insane person." The order of February 2, 1933, entered by the county court of Cook county finding Price sane and restoring him to his rights and privileges, as the order of the probate court, satisfied jurisdictional requirements. These orders were properly received in evidence. (*Illinois Merchants Trust Co.* v. *Turner,* 341 Ill. 101; *Searle* v. *Galbraith,* 73 id. 269.) Objection to the validity of the proceedings in the county and probate courts, if any, must be raised in those courts. *Healea* v. *Verne,* 343 Ill. 325.

By his separate appeal, defendant contends that the chancellor erred in the construction of section 10 of the trust deed relating to the residuary property. It is insisted that the trust deed or agreement created an active trust and that the trust remained active and title remained in defendant, as trustee, after Price's death until a conveyance to and division among the beneficiaries by the trustee. In particular, the argument is made that the grantor empowered the trustee to divide the articles of personal property and parcels of real estate among the beneficiaries, and that, in making a division, the trustee could convey or transfer an individual share to each beneficiary provided the division be equitable. The tenth section of the trust agreement provides that upon the death of Price, the residue and remainder of his property "shall be divided equally, share and share alike," among the named beneficiaries. By the foregoing language an active trust was created to continue so long as Price lived when the active duties of the trustee were to terminate and the *corpus* of the trust be divided. A trust which is active may become passive after all of the active duties have been performed and the trust may become executed by the Statute of Uses and the title vested in the beneficiaries. (*Reichert* v. *Missouri and*

*Illinois Coal Co.* 231 Ill. 238; *Cary* v. *Slead,* 220 id. 508; *Moll* v. *Gardner,* 214 id. 248.) It follows that the title to the real estate vested in the three plaintiffs and the defendant immediately upon Price's death and that defendant was then without authority to sell and convey the real estate and divide the proceeds of such sale. The mandatory provision that plaintiffs and defendant take the property "share and share alike" must be effectuated. Only in the ninth section of the trust agreement is the trustee granted any discretion with respect to the division of any property, a discretion applicable solely to the household furniture and other personal property on the farm. Had Price intended to give defendant, as trustee, discretion as to the division of the residuary property, either real or personal, appropriate language expressing such an intent would undoubtedly have been employed.

Defendant's complaint with respect to the portion of the decree directing a re-conveyance of the Artesian avenue property to plaintiffs and himself as tenants in common is not well taken. He concedes that he holds this property in trust. Accordingly, a conveyance to take title out of himself as an individual and to place it in plaintiffs and himself, as cotenants, was correct.

It appears that on November 15, 1938, plaintiffs leased the Glenora farm, in Kane county, to Morris Van Thournout for a period of years commencing March 1, 1939. It also appears that on January 30, 1939, defendant, as trustee, leased the same property to William Connery for three years, commencing March 1, 1939. Defendant urges that the decree is erroneous in failing to hold that plaintiffs were without authority to execute a lease of the farm. The trust agreement affords defendant no basis for leasing the farm after Price's death. When the time for the determination of a trust arrives, even though the trustee still holds the title to the trust property, his power to make leases ordi-

narily ceases. (2 Restatement of the Law of Trusts, sec. 344(e).) It may be conceded that under some circumstances the trustee might make a short lease in order to keep the property productive. Such, however, is not the case here presented.

Finally, defendant contends that the chancellor erred in taxing one half of the fees allowed the master in chanery against him individually. The other one-half was .assessed against plaintiffs. The court also found that stenographic charges in the amount. of $402.75 should be paid equally by plaintiffs and the defendant. We are of the opinion that the chancellor did not abuse his judicial discretion in either the allocation of costs or in the assessment of costs for stenographic services. Defendant points out that the certificate of the master covering stenographic fees related only to services rendered on his own behalf. If so, he is obviously in no position to complain.

On rehearing we have again carefully re-examined all the testimony in the record. We have also carefully read all the authorities cited and all arguments made in connection therewith. From such reconsideration, regardless of the extravagant and unfounded statement in the petition for rehearing, we are still of the opinion that no material evidence has been overlooked and that no facts have been .disregarded or misunderstood. The gratuitous and repeated statement that all prior decisions have been disregarded and overruled, deserves no serious comment. Such argument is neither dignified nor convincing. To adopt it would be to lose sight of the substance of the transaction involved and aimlessly pursue its shadow.

The decree of the circuit court is affirmed.

*Decree affirmed.*