**F. Morris TROTTER, Respondent,**

**v.**

**Mildred E. TROTTER, Helen N. Patton, St. Louis Union Trust Company, a corporation, Third Baptist Church, Euclid Baptist Church, Missouri Baptist Children's Home, Baptist Old Folks Home, Boys Town of Missouri, Inc., and Imperial Council of the Ancient Arabic Knights of the Nobles of the Mystic Shrine For North America, Appellants.**

**No. 46365.**

Supreme Court of Missouri,

Division No. 2.

Sept. 8, 1958.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 13, 1958.

Tralles, Hoffmeister & Gilpin, Fred J. Hoffmeister, St. Louis, for appellants.

Carter & Fitzsimmons, Clayton, for plaintiff (respondent).

LEEDY, Judge.

 This is an appeal from a decree which terminated two living trusts created

by the plaintiff, F. Morris Trotter, and required the defendant trustees, St. Louis Union Trust Company and Mildred E. Trotter, to pay over to him all of the corpus and undistributed income thereof freed of all claims by defendants founded on such trust indentures. The value of each trust is far in excess of $7,500, so that appellate jursidiction is vested in this court. Art. V, § 3, Const. of Mo.1945, V.A.M.S.

In one of the trusts grantor and his (then) wife, Mildred E., are named as beneficiaries to receive, "in monthly or other convenient installments, the entire net income derived therefrom, in equal portions * * * as long as they shall live, and upon the death of either of them, all the net income shall be paid to such survivor as long as he or she shall live." Upon the death of the survivor of them, grantor's (then) mother-in-law, Helen N. Patton, is named as successor beneficiary; and upon the death of the last surviving beneficiary above named, the property then constituting the trust estate shall be distributed free from trust to seven named charitable beneficiaries in equal shares.

In the other trust Helen N. Patton is named as life beneficiary to receive the income. Upon her death the trust continues for the benefit of grantor's (then) wife, Mildred E., for life. Upon the death of Mildred E., and after the death of Helen N. Patton, the trust continues for the benefit of grantor for life; upon the death of the last survivor of Helen N. Patton, Mildred E., and grantor, the same disposition of the trust property is made as in the case of the other trust, i. e., to the seven named charities.

Both trust indentures contain identical sections eight, reading as follows: "This trust is hereby created, and the interests hereunder are vested, with the express understanding and condition, that the Grantor shall have no power to alter or amend the terms of this agreement, or to revoke this agreement in whole or in part, so that this trust shall be irrevocable, and the Grantor

shall have no power to free any sums of money, securities or other property made subject hereto from the terms of this trust at any time."

Plaintiff sought the relief granted by the trial court on these grounds, as alleged in paragraphs 4 and 6, respectively, of his petition:

(4) That he "had no independent legal advice as to the nature and extent of the legal rights that would be created and terminated by the indentures of trust; that prior to the execution of the two trust indentures, the defendant, the St. Louis Union Trust Company summoned to its offices an attorney of its own selection who advised the plaintiff that the trusts were not irrevocable and could be broken; that the plaintiff acting on this advice and under the mistaken belief as to the legal effect of the trust indentures, duly executed the trust indentures * * * never intending to place the money and other assets that now constitute the corpus of said trusts forever out of his control and beyond his powers of enjoyment."

(6) That plaintiff's "motives, intentions and objectives in creating such trusts was so that the benefits that would accrue therefrom, should accrue to the defendants, Mildred E. Trotter and Helen N. Patton, so long as, and only so long as the marriage relationship between plaintiff and Mildred E. Trotter should exist; that the defendant, Mildred E. Trotter, by having the legal bonds of that marriage severed, has rendered it impossible for the achievement of the intentions, motives and objectives that plaintiff had in mind when these trusts were established."

In jointly answering the foregoing paragraphs of plaintiff's petition, Mildred E. Trotter, Helen N. Patton and St. Louis Union Trust Company averred:

"4. [T]hat prior to and at the time of the execution of the two trust indentures referred to in plaintiff's petition, plaintiff did have legal advice from his own counsel,

and on the advice of and in the presence of his said counsel, conferences were had with officials of defendant St. Louis Union Trust Company, at which conferences all of the facts relative to the trusts which plaintiff desired to enter into were fully discussed; that plaintiff was further advised by his counsel as to his legal rights and obligations under the trust instruments which he contemplated executing and that plaintiff was particularly advised that said trusts would be irrevocable and could under no circumstances be revoked or terminated during his lifetime; that after being so advised, plaintiff stated that it was his intention to proceed with the execution of the two irrevocable trusts and instructed his counsel to proceed accordingly.

"Further answering Paragraph 4 of plaintiff's petition these defendants specifically deny that the defendant St. Louis Union Trust Company summoned to its offices an attorney of its own selection who advised the plaintiff that the trusts were not irrevocable and could be broken, and also specifically deny that the plaintiff, acting on this advice under the mistaken belief as to the legal effect of the trust indentures, executed the same never intending to place the money and other assets constituting the corpus of said trusts forever out of his control and beyond his powers of enjoyment. On the contrary, as hereinbefore stated, plaintiff insisted on executing two trusts that were irrevocable after having been fully advised by his counsel of all of his legal rights and the obligations which would be incurred by the execution of said trusts.

"6. Answering Paragraph 6 of plaintiff's petition these defendants deny each and every allegation contained therein. Further answering said Paragraph 6 these defendants state that plaintiff was fully advised by his counsel that the trusts which he contemplated executing would be irrevocable even though the legal bonds of his marriage with the defendant Mildred E. Trotter might be severed; that he made no objection thereto but insisted and requested that the said trust indentures be drawn and executed as irrevocable instruments."

As orginally filed, the petition contained the further allegation that during the marriage plaintiff was dominated by his wife and mother-in law and while under such domination which amounted to duress, he executed the trust instruments. Before trial, this ground was expressly withdrawn and voluntarily stricken from the petition.

In our view, this is a fact case, and determinable accordingly. The defendants contend that the decree is not supported by the evidence and is against the weight of the evidence. On appeal in an equity case the appellate court tries it de novo on the record as made in the trial court; as it is sometimes expressed, the reviewing court weighs the evidence and arrives at its own conclusion as to its weight, but takes into account the trial chancellor's position to judge the credibility and characteristics of the witnesses. Peine v. Sater, Mo., 289 S.W.2d 101, 102; McCoy v. McCoy, 360 Mo. 199, 205, 227 S.W.2d 698, 703.

The creation of the trusts stemmed from a wholly unexpected inheritance of approximately 1,000 shares of General Motors stock which plaintiff-grantor received in 1950 from the estate of an uncle who had lately died in Florida. The trust instruments were executed September 6, 1951. Plaintiff and his wife were married in 1944. Thereafter, and prior to the execution of the trust instruments, plaintiff's mother-in-law, Mrs. Helen N. Patton, lived with them in St. Louis in what is conceded to have been an entirely happy and congenial family relationship. Plaintiff and his wife were divorced June 28, 1955, on her cross-bill in an action filed by the husband. Plaintiff was 51 years of age at the time of the trial. He had had a high school and business college education. At the time of his marriage, and until April, 1952, he was employed at St. Louis Dairy Company as a clerk in the credit department at a salary of $300 per month, adjusting customer complaints about bills. When he came into

his unexpected inheritance, the Trotters were "flabbergasted," as she put it, and discussions in the household immediately followed as to what to do with the money. From the record it is apparent that plaintiff did not want the responsibility of handling so much money, and the idea of discussing the problem with Mr. Bryan Gross, then Assistant Vice President (formerly Trust Officer) of St. Louis Union Trust Company was suggested either by Mrs. Patton or plaintiff's wife. Gross and Mrs. Patton were old friends, having been reared in the same Gasconade County community and attended the same country school. Plaintiff quoted Mrs. Patton as saying she thought Mr. Gross would "give us good advice in the setting up of this trust." Conferences with Mr. Gross followed, first, by Mrs. Trotter alone (she testified—and plaintiff substantially admitted—that this was done at his request because of his inability to get away from his job at the dairy during office hours), and later with plaintiff himself. Plaintiff admitted that it was upon the advice and insistence of Gross not to put the whole of the inheritance in the trusts (as originally contemplated by plaintiff) that a block of 300 shares was withheld so that he might have something "to fall back on." At the time of trial the value of the securities in the two trusts aggregated $80,851.00. There are sharp conflicts in the respective versions of the parties as to when and where the discussions leading up to, and as to the actual signing of, the trust instruments took place, but this circumstance is not of any real importance in the determination we feel constrained to make of the case; and development of those conflicts would perhaps only serve to buttress our conclusions touching credibility, and this is deemed unnecessary.

■ As we approach the facts upon which we think the case really turns, it should be borne in mind that plaintiff's petition does not raise, nor are we confronted with, any issue made by the pleadings of undue influence, fraud, or want of mental capacity. Notwithstanding the want of any such pleaded issues, the plaintiff contends that there was a confidential relationship existing between himself, his wife and his mother-in-law, and because of this there was cast upon the latter defendants the affirmative burden of showing that in creating these trusts he "had independent advice and that he acted freely without undue influence of others." In support he cites Overstreet v. Beadles, 151 Kan. 842, 101 P.2d 874; Jackson v. Pillsbury, 380 Ill. 554, 44 N.E.2d 537, and Bogert on Trusts and Trustees, §§ 43, 482 and 992, but no Missouri cases. The cases he relies on are based on the concept that a confidential relationship raises a presumption of fraud or undue influence, whereas in this jurisdiction that principle does not apply. See Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772, where, overruling former cases, it was held that a mere confidential relationship between a testatrix and legatee raised no presumption of undue influence. That, of course, was a will case, but equity would apply the same principle in a trust situation.

The trust instruments were drafted by Mr. Clarence A. Weindel, an experienced attorney practicing in St. Louis who specializes in estate planning and probate work. He had previously, in one instance, acted in the capacity of attorney for the Trotters and Mrs. Patton, having in 1948 drafted wills, for them, respectively. They had been originally referred to Mr. Weindel by Mr. Gross. The record leaves no doubt of the fact that while Weindel was first contacted with respect to the trusts by Mrs. Trotter, this was done merely as a matter of convenience to, and with the knowledge and consent of, her husband, so that the claim that the attorney was not of his own selection passes out of the case. The question, then, is narrowed under the pleadings as to what representations were made by the attorney concerning the legal effect of the trust indentures.

Plaintiff was the sole witness called on his side of the case. Going directly to the

matter of the advice given him by the attorney relative to the effect of the trust instruments, we find his testimony on this point is fragmentary. The only such advice we find, as testified on direct examination by plaintiff, is shown by the following three questions and answers:

"Q. On the day of this first meeting when Mr. Weindel was present, do you recall any statements he might have made as to the legal effect of these trust agreements? A. Mr. Weindel advised against it, but he also stated that they could be broken through the court.

"Q. Did you ask him that particular question, whether they could be broken? A. I did.

"Q. And did he advise you that they could be broken by court action? A. He did."

This vital matter was developed more fully on cross-examination of the witness in this fashion:

"Q. Now, when you went down there [to the office of Mr. Gross at the St. Louis Union Trust Company] with your wife what did you tell him you wanted to do? A. Set up a trust fund.

"Q. And he discussed with you trusts generally, did he not? A. Yes, sir.

\*　\*　·\*　\*　\*　\*

"Q. Did you have any discussion about the irrevocable feature of these trusts you intended to execute? A. Yes; Mr. Weindel advised against it. He did advise.

"Q. Mr. Weindel advised you against it, did he? A. Yes, sir.

"Q. And why did he say he was against it? A. I—I don't recall on that. He just advised against it. I don't recall—I don't recall.

"Q. And did Mr. Gross also advise against it? A. Yes, sir.

"Q. In other words, you had a general discussion there about the advisability of executing irrevocable trusts, did you not? A. Yes, sir.

"Q. And both of these gentlemen advised you against it? A. Yes, sir.

"Q. And what did you have to say? A. I asked Mr. Weindel if in any case they could be broken, and he said 'Yes.'

"Q. He said they could be broken? A. Yes, sir.

"Q. You're positive of that, are you? A. Yes, sir, I'm positive.

"Q. Now, in what cases did you say they could be broken? A. By going through court.

"Q. And on what grounds could they be broken by going through court? A. He—he didn't say. He just made the—mentioned that they could be broken. Other than that he didn't state the grounds; he didn't say the grounds.

"Q. Did he mention fraud? A. No, sir.

"Q. Didn't mention fraud? A. No, sir.

"Q. Didn't mention any reason on which they might be broken? A. No, sir.

\*　\*　\*　\*　\*　\*

"Q. After Mr. Weindel and Mr. Gross both told you that these trusts would be irrevocable and what the effect would be, you insisted on going on executing those, did you not? It was your idea to execute them? A. Yes, sir."

Weindel, called on defendants' part, testified that the first contact he had with the parties in connection with these transac-

tions (after a preliminary conversation over the phone with Mrs. Trotter) was at a lengthy evening conference held at the plaintiff's residence, at which plaintiff, his wife and mother-in-law were present; that plaintiff there stated that he had had some discussion with Mr. Gross with reference to establishing trusts for himself and his wife, and for his mother-in-law; witness stated that forms of trusts were discussed, both revocable and irrevocable, and that plaintiff stated he had in mind an irrevocable trust. Witness cautioned plaintiff and explained to him fully the effect of an irrevocable trust, and when pressed for a reason for wanting to create an irrevocable trust, the plaintiff stated he wanted to put it beyond his reach—"he seemed to have a fear of being able to manage it, and he wanted to put it beyond his power to ever get it." Witness further explained to plaintiff "his very deep-seated feeling against irrevocable trusts because of their being a perpetual source of trouble and misunderstanding", and advised that he have a revocable trust "and later on if you see it works out all right, you can amend it and make it irrevocable," pointing out that his social status might change, such as by divorce or death of his wife, subsequent remarriage with children, etc., and stated to him "you couldn't bring your second wife into this picture, or your children by that second wife; that would be the situation with reference to both trusts." (In his testimony, plaintiff had stated that Weindel did not advise him that in the event his marriage should be terminated by divorce that these instruments could not be broken.) The witness continued: "I told them I had deep-seated feelings against it. 'Well,' he said, 'Mr. Gross at the Trust Company also warned us about it,' but, he says, 'That's the way I want it.' I said, 'All right; if that's the way you want it, that's the way it shall be.' * * *

"Q. Mr. Weindel, did you ever tell Mr. Trotter that this trust could be revoked or terminated by judicial action?

"A. No, sir; I never discussed how a trust could be eliminated; how it could be set aside * * *.

"Q. Was there ever any discussion about termination of the trust between you and Mr. Trotter?

"A. I told him it could never be revoked with this clause in it."

Gross was called on the part of defendants, having in the meantime retired (on account of age), and was no longer associated with the Trust Company. He told of Mrs. Trotter having come to see him (about the time the inheritance was received) to talk about creating a trust and conferring with him about the matter. The witness stated, by way of summary, and without objection, "It seems to me that all my discussion with Mrs. Trotter, and later with Mr. Trotter, could be summed up in a few words by saying that I tried to do everything I could to convince them that they should not create an irrevocable trust. Because of experience that I had seen and troubles I had seen with irrevocable trusts, I did everything in my power to talk her out of it." Asked if he was present when the trusts were executed, he answered: "I took these instruments to their home where they lived and had them executed by Mr. Trotter in his home, and it happened to be on September the 6th of 1951," which date he remembered because it was Mrs. Patton's birthday and he told her he thought she had received "a right nice birthday present that day from her son-in-law." On that occasion there were present Mr. and Mrs. Trotter, Mrs. Patton and himself. The witness was asked if he discussed the trusts with Trotter the night they were executed; whereupon the following occurred:

"A. Well, I very frankly said to Morris that night—whom I had known sufficiently to call him by the first name—I said, 'Morris, you know I've tried to talk you out of this ever since the idea had started, but if you still insist on executing it, and you

do, forever hold your peace.' I told him he would be barred from doing anything to break it.

"Q. Did he have any answer to that?

"A. No, sir; he took his pen and he executed it."

Plaintiff's former wife testified at length on behalf of defendants, but to reproduce even a summary of her testimony would be simply to add to and corroborate that of Weindel and Gross.

 From the foregoing summary of the proofs on the essential and decisive questions in the case, we think plaintiff's evidence is wholly insufficient in weight and value to sustain his claim, and that that on the part of defendants fully supports their defense. In reaching this conclusion we have, of course, considered plaintiff's self-interest as opposed to the disinterestedness of the witnesses Gross and Weindel, and the want of any clear explanation or proof of the nature of his supposed misunderstanding of the attorney's representation as to the legal effect of the instruments. But there are circumstances that speak quite as plainly and directly as did the witnesses in refuting plaintiff's claim of mistaken belief, which circumstances also support our conclusion that the decree rendered should not be permitted to stand. For example, if plaintiff's belief at the time was that the trusts "could be broken by going to court," why did he not reject also the further advice of Mr. Gross under which the block of 300 shares was withheld as something to fall back on? And the question arises at once that if plaintiff so understood, why did he not assert his claim at the time of the divorce? That, of all times, would have been the most logical and propitious. Instead, for aught that appears, not the slightest complaint about the irrevocable nature of the trusts was asserted in connection with the divorce litigation nor until six months later when the present action was filed, so it is apparent that this delay, when considered in connection with plain-

tiff's own admissions (hereinabove set forth), is highly significant on the question of his understanding of the nature of the trusts as being revocable, and corroborates the testimony of the witnesses Gross and Weindel that the trusts were executed with the full knowledge and intent on his part to make them irrevocable. The weight of the evidence forces the conclusion that the trusts were so executed, from which it follows that the decree should be, and it is, reversed.

All concur.