GARY-WHEATON BANK, Plaintiff-Appellant, *v.* HENRY J. BURT, JR.,
Defendant-Appellee.

Second District    No. 81-352

Opinion filed March 10, 1982.

Robert C. Liston, of Wheaton, for appellant.

R. Terence Kalina, of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

Plaintiff, the Gary-Wheaton Bank (bank), brought this suit against the defendant, Henry J. Burt, Jr., seeking to collect on a "duplicate original" promissory note given to the bank as collateral for a loan it made to Little Bear, Ltd. The bank alleged that it had loaned money to Little Bear, Ltd., a limited partnership of which Burt was a limited partner, taking as collateral an assignment of this note which was payable to Little Bear, Ltd., by Burt as payor. The loan was not paid when it became due, and the bank obtained a default judgment against Little Bear, Ltd. for the amount of the loan plus interest. That judgment was not paid, and the bank in this action is seeking payment from Burt alone. Following a bench trial, the court found for Burt and against the bank.

The evidence is substantially undisputed. It shows that in 1973, Burt

purchased, in his name alone, a three-tenths interest in Little Bear, Ltd., a limited partnership. The interest which was in Burt's name was in fact a joint venture consisting of Burt, James Knippen, Fredrick Noorlag and Paul Matson. In June 1974, Burt acquired another three-tenths interest. For each three-tenths interest, Burt paid $30,000 cash and executed a nonnegotiable note for $121,200 which was in his name alone. The notes were to be paid in annual installments of $24,240 over a period of five years. The first note, the subject of this suit, was executed on December 15, 1973, and the first installment was due November 15, 1974. The second note was executed June 15, 1974, and the first installment was due December 1, 1974. The notes were made payable to Little Bear, Ltd.

Colorado Little Bear Company, Inc., was the general partner of Little Bear, Ltd. Donald Janson was the president and shareholder of Colorado Little Bear Company, Inc. The stated purpose of Little Bear, Ltd., was to purchase and develop land in Colorado, specifically, 290 acres known as the Hagemeister Ranch. In late 1973 or early 1974, Donald Janson, acting for Little Bear, Ltd., bought the Hagemeister property under contract.

In June 1975, Janson contacted Burt about seeking a loan for Little Bear, Ltd., so it could meet its obligation on the next installment due on the Hagemeister property contract. Burt had thought the payments from his and the other limited partners' capital notes were sufficient to pay the installments on the Hagemeister contract when they fell due. When Burt asked Janson about this, Janson told him that he had run into unexpected expenses when trying to get the Hagemeister property rezoned. Janson also informed Burt that he was negotiating for the purchase of a piece of property contiguous to the Hagemeister property which already had the suitable zoning.

Burt agreed to contact Jerry Bradshaw, president of the Gary-Wheaton Bank, to arrange a meeting to discuss a loan. On June 9, 1975, Burt and Janson met with Bradshaw to discuss the loan. Charles Thorson, vice-president and Loan Division manager, was also present at the meeting. The amount of the loan discussed was $38,000. It was to be used to make an installment payment under the land purchase contract with Hagemeister.

Since Burt's father was a director of the bank and Burt's law firm had represented the bank from time to time in the past, Bradshaw wanted to act favorably on the loan request. When it was agreed that the loan would be made, Bradshaw gave Thorson the authority to structure the loan as he saw fit. Thorson requested that Burt personally guarantee the note evidencing the loan, which Burt refused to do. Burt agreed that the note which he had executed December 15, 1973, be used as collateral for the loan. Thorson requested an assignment of the note from Little Bear, Ltd., and delivery of the original note for their files. Thorson also requested

financial statements of Janson, Little Bear, Ltd. and Burt. The loan was to be due in six months, on December 18, 1975, and to be repaid from amounts due the partnership as evidenced by Burt's note.

Janson took the financial statements and a photocopy of Burt's note to Thorson's office on June 17, 1975. At that time Thorson requested the original of the note. Janson then went to Burt and requested that he execute a duplicate original of the note as the original was in safe keeping in Colorado. Burt said Janson told him he wanted to expedite matters and believed it would take too long for the original note to arrive from Colorado. Burt then agreed to execute the duplicate on the condition that the words "DUPLICATE ORIGINAL" were typed across the face "so that the Bank would know that that was not the note that they agreed to accept as collateral." Burt further told Janson that he conditioned the signing of the duplicate original on the ground that the monies for the loan would not be disbursed until the bank received the original note. Burt signed an unsigned photocopy of the original note which he had executed on December 15, 1973, and typed at the top "DUPLICATE ORIGINAL."

Thorson testified that Janson returned on June 18, 1975, with the assignment of the note and the "duplicate original" note. Janson told Thorson the original note was safe in Colorado. However, he never told Thorson to delay disbursement of the funds until the original was presented. The bank accepted the note marked "DUPLICATE ORIGINAL" as collateral for the loan. The bank paid $40,000 to Colorado Little Bear Company, Inc., in check number 018643 dated June 18, 1975. Thorson never tried to obtain the original of the note which had been pledged to the bank.

Burt testified that he was not actively involved in any transactions negotiated on behalf of Little Bear, Ltd. He believed that his note and the notes of the other limited partners were the only assets of the partnership. Burt made no representations at the June 9, 1975, meeting concerning Little Bear, Ltd.'s financial condition. Also, Burt did not know his December 15, 1973, note had in fact been previously pledged by Janson to Hans Hagemeister as security for the payments on the land contract.

Within one or two months after the bank had loaned Little Bear, Ltd., the money, Burt learned that his note had been used to secure the Hagemeister contract. Both Burt and Thorson testified that Burt contacted Thorson in the fall of 1975 to warn him of financial problems of Little Bear, Ltd. Prior to Burt's warning, Thorson had been told by another bank employee that Hawthorne Bank was involved in litigation concerning capital contribution notes of Little Bear, Ltd.[1]

---

[1] The second note, given for the second three-tenths interest, dated June 15, 1974, had been pledged as security for a loan from Hawthorne Bank. Hawthorne Bank sued upon this note.

Hagemeister sued Burt and the other limited partners of Little Bear, Ltd., on Burt's original note in Federal district court in Chicago. There was a release of the note pursuant to a settlement in excess of $100,000. Burt paid his share of the settlement, which amounted to $36,500. Burt was also involved in another case with Hawthorne Bank concerning the second note he had executed. The Gary-Wheaton bank was not involved in either of these suits. In an order dated June 13, 1977, in the litigation with Hawthorne Bank, Burt was relieved of all responsibility to the limited partnership.

Bradshaw testified that at the time the loan was finalized by Thorson, that he, Bradshaw, did not know that the note which was used for collateral was a duplicate original. In his experience as a banker, he has never seen as collateral a note marked "duplicate original." Thorson also testified that he had never seen a duplicate original promissory note used as collateral. Burt called William J. Davis to testify as a banking expert. After a hypothetical question had been presented to him, Davis testified that good banking practice requires that you should inquire into the whereabouts of the original document. Davis believed that here there was a deviation from reasonable banking standards in effect at the time of the transaction.

The trial court found against the bank on all three of its theories stated in its second amended complaint which were based upon (1) an obligation created by the "duplicate original" note; (2) an implied contract which guaranteed the loan to Little Bear, Ltd.; and (3) an actual or constructive fraud by Burt. On appeal the bank raises the following issues: (1) that the court erred in not finding a constructive fraud; (2) that the court erred in not finding an implied contract; (3) that the court erred in not finding an obligation was created by the "duplicate original" note; (4) that Burt was estopped from raising any defense against the validity of the "duplicate original" note; (5) that two of Burt's affirmative defenses, failure of consideration for the note and collateral estoppel by a judgment entered in another case, were not available to him; and (6) that two findings of fact by the court were against the manifest weight of the evidence. The bank has abandoned any claim based upon a theory of actual fraud.

The bank contends that although the signing of the "duplicate original" note did not create a double obligation, the act of pledging the second note to secure a second obligation did. The trial court found that in view of Burt's refusal to personally guarantee the loan to Little Bear, Ltd., and his clear limitation of liability on the capital note, there was "no conduct by the parties to believe there was any intent that this [duplicate original] note was to be, in effect, some accommodation or guarantee." The issue to be resolved is what is the legal effect of the "duplicate

original" note under the facts and circumstances presented in the record before us.

■■ Generally, when a substitute instrument is executed subsequent to the original, it adds no more to the obligation, liabilities or rights of the parties to the instrument than does the contemporaneous execution of a duplicate note along with the original. It is merely new evidence of the same debt, and no new liability is created thereby. (11 Am. Jur. 2d *Bills and Notes* §59 (1963).) In *Samland v. Ford Motor Co.* (1932), 123 Neb. 819, 244 N.W. 404, when a duplicate note was issued for a check which had been lost and "duplicate" had been written across the face of the note, the court held that the duplicate added no more to the obligation and rights of the parties. (123 Neb. 819, 826, 244 N.W. 404, 407.) Duplicate is defined as two written documents which are substantially alike, "so that each might be a copy or transcript from the other, while both stand on the same footing as original instruments, they are called 'duplicate.' * * * The term is also frequently used to signify a new original, made to take the place of an instrument that has been lost or destroyed, and to have the same force and effect." Black's Law Dictionary 593 (4th ed. 1957).

The bank cites *First Trust & Savings Bank v. Powers* (1945), 325 Ill. App. 600, 60 N.E.2d 582, *reversed* (1946), 393 Ill. 97, 65 N.E.2d 377, as standing for the proposition that when a writing is executed in duplicate or multiplicate, each copy has the same legal effect as any other copy; no original need be produced. Upon examination of this case, we find that the court was referring to copies contemporaneously executed. The court was also merely ruling on the admissibility of said duplicate documents into evidence under the best evidence rule. The court does not mention the legal effect of a duplicate executed at some time subsequent to the execution of the original. This case is inapplicable to the present situation.

Examination of the pertinent facts gives the best indication of what the intentions of all the parties were as to what was to be the collateral for the loan to Little Bear, Ltd. It was obviously to be the original note. Bradshaw testified that Burt said his existing promissory note would be collateral. Thorson testified that when Janson brought him a photocopy of the original note, he told him he needed the original note. Thorson further said he had never conceived of a duplicate note being used. Yet that is what the bank accepted instead of the original note. Burt testified that he executed the "duplicate original" as evidence to the bank that the original note was in existence but instructed Janson to furnish the bank the original note prior to any disbursement of the loan. Thus, it appears to us that the "duplicate original" note was not intended to create a new obligation. While the bank eventually accepted the "duplicate original" note as collateral instead of the original note, it is evident that the collateral still was the original note.

■■ While it is true generally that a creditor may look to collateral for payment of a loan when the principal defaults (see *General Grocer Co. of Illinois v. Bachar* (1977), 51 Ill. App. 3d 907, 365 N.E.2d 1106), here the parties intended the original note to be the collateral. The bank accepted the "duplicate original" as the collateral instead of waiting for the original note. Since the "duplicate original" is merely evidence of the same debt and creates no new liability (see 11 Am. Jur. 2d *Bills and Notes* §59 (1963)), the "duplicate original" note did not evidence any obligation upon which the bank could collect in case Little Bear, Ltd., defaulted upon the loan. The bank, in accepting a "duplicate original" note knowing the original note was the collateral, cannot now attempt to create a new obligation upon learning that the original note had been previously assigned to someone else. Under the rather unique circumstances here, there can be no cause of action against Burt based upon the "duplicate original" note.

The bank advances next the argument that there was a "special relationship" between the bank and Burt out of which arose a duty on the part of Burt to disclose all information material to this transaction. The bank contends that the failure by Burt to disclose information about the financial condition of Little Bear, Ltd., and to inform the bank that the proceeds of the loan should not be disbursed until the bank received the original note amounted to a constructive fraud in view of this "special relationship." The "special relationship" purportedly arises from the fact that Burt's father was on the board of directors of the bank, Burt's law firm had represented the bank, and Burt was well known to Bradshaw, president of the bank.

■■ Generally, fraud means anything intended to deceive, including all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence resulting in damage to another. (*Carey Electric Contracting, Inc. v. First National Bank* (1979), 74 Ill. App. 3d 233, 236, 392 N.E.2d 759.) Actual fraud is any false misrepresentation of a material fact made with knowledge of its falsity and with intent that it be acted upon and which is acted on to the injury of the other contracting party. (*Pustelniak v. Vilimas* (1933), 352 Ill. 270, 275, 185 N.E. 611; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393.) Fraud may also be inferred from the relationship of the parties or the surrounding circumstances regardless of any actual dishonesty of purpose. This type is called constructive fraud, and is defined as "any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence. It requires neither actual dishonesty nor intent to deceive, being a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others." (*In*

*re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568, 378 N.E.2d 1345.) A constructive fraud is presumed from the circumstances and condition of the immediate parties to the transaction and the concern is with the relationship of the parties and whether a fiduciary relationship either in fact, or in law, existed between them. (*Zeilenga v. Stelle Industries, Inc.* (1977), 52 Ill. App. 3d 753, 757, 367 N.E.2d 1347.) Where a fiduciary relationship does not exist as a matter of law, *e.g.* principal and agent, attorney and client, it may nonetheless arise where trust and confidence, by reason of friendship, agency and experience are reposed by one person in another who, as a result, gains an influence and superiority over him. (*Wold v. Wold* (1976), 43 Ill. App. 3d 773, 777, 357 N.E.2d 627.) "Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship. A confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another." *Carey Electric Contracting, Inc. v. First National Bank* (1979), 74 Ill. App. 3d 233, 238, 392 N.E.2d 759.

■■ Clearly there is no fiduciary relationship which arises here as a matter of law, nor does the bank so contend. Nor do we find that the relationship between Burt and the bank under the circumstances was a "special relationship" which created a duty on Burt to speak, the absence of which may create a constructive fraud. There is nothing in the record to indicate that Burt or his law firm currently was an attorney for the bank or that his father's status as a director of the bank had direct influence on this or any previous transaction with Burt. While Bradshaw wanted to make this loan to Little Bear, Ltd., because of a long relationship with Burt, this alone is insufficient to create a fiduciary relationship. (See *Carey Electric Contracting, Inc. v. First National Bank* (1979), 74 Ill. App. 3d 233, 392 N.E.2d 759.) In addition, there is no indication that Burt withheld relevant information to the detriment of the bank. Thorson knew the loan was to fund an installment payment due from Little Bear, Ltd., on an installment purchase contract, was aware that Burt specifically refused to personally guarantee the loan, realized that Little Bear, Ltd., was the party with which the bank was directly dealing for the loan, and received financial statements from Janson, Little Bear, Ltd. and Burt plus a copy of the limited partnership agreement. Burt had no knowledge that the original note had previously been assigned to a third party, and thus, did not himself mislead the bank. The bank and Burt possessed the same knowledge about the need for the loan in order to meet a current installment payment. We believe from this record that the trial court was correct in finding that there was no constructive fraud.

As another alternate theory of recovery, the bank contends that an

implied contract arose directly between it and Burt. The bank alleges that this theory is "predicated upon the fact that defendant, through his words and actions during the loan application conference * * * led plaintiff to believe that: (a) he was indebted to Little Bear, Ltd. on the promissory note in question; (b) that he owed four payments thereon of $24,240 each due 11-15-75, 11-15-76, 11-15-77, 11-15-78; (c) that each of said payments would be paid when due; (d) that by virtue of the assignment/pledge of said note to plaintiff, he would make said payments directly to plaintiff (in the event Little Bear, Ltd. failed to pay) to the extent of the liability owed by Little Bear, Ltd. to plaintiff."

There are two theories of implied contract, a contract implied in law and a contract implied in fact. A contract implied in law exists from an implication of law that arises from facts and circumstances independent of an agreement or consent of the parties. It is equitable in nature and based on the premise that no one should unjustly enrich himself at another's expense. (*Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 875, 400 N.E.2d 614.) A contract implied in fact arises not by express agreement but by a promissory expression which may be inferred from the facts and circumstances which show an intent to be bound. (*Frey v. Belleville News-Democrat, Inc.* (1978), 64 Ill. App. 3d 495, 381 N.E.2d 705.) "In a contract implied in fact the agreement defines the duty; in a contract implied in law the duty defines the contract." (*Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 875, 400 N.E.2d 614.) Both theories are based on *quantum meruit* or unjust enrichment; a party should not receive a benefit which would be unjust for him to retain without paying for it. *Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 626, 418 N.E.2d 444; *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 486, 408 N.E.2d 1069.

The bank relies mainly on *Central National Bank & Trust Co. v. Consumers Construction Co.* (1972), 5 Ill. App. 3d 274, 282 N.E.2d 158, to support its allegation of an implied contract. There the bank refused to make a loan to a subcontractor because it could not get a sufficient financial statement concerning the subcontractor. The subcontractor later presented the bank with two letters from the general contractor. These letters verified the existence of a contract between the general contractor and the subcontractor and also stated when and how much the subcontractor would be paid. On the strength of these letters, the bank made the loan to the subcontractor.

The subcontractor defaulted on the contract with the general contractor, who then refused to pay either the subcontractor or the bank. The bank sued the general contractor. The trial court found that the bank was a third-party beneficiary to the contract between the general contractor

and the subcontractor. Thus the bank derived its rights from the subcontractor. Since the subcontractor could not collect on the contract because it had defaulted, the bank also was barred from collecting from the general contractor. In reversing, the appellate court found that the effect of the letters was a contract between the bank and the general contractor. The court found that the promises made by the general contractor in the letters constituted a detriment to the bank, in that it loaned money in reliance on them, and a benefit to the general contractor, in that the loan enabled the subcontractor to do work for it.

■■ That situation is clearly distinguishable from the case at bar. Burt never made any representations to the bank concerning Little Bear, Ltd.'s financial condition. The bank received a separate financial statement of Little Bear, Ltd., from Janson. Burt expressly refused to personally guarantee the loan to Little Bear, Ltd. Also, he made no representations to the bank that the promissory note would guarantee the loan, merely that it could be used as collateral to secure the loan. There was no express or implied representation by Burt, as there was by the general contractor in *Central National Bank*, that the loan would be paid by him. The loan here was between the bank and Little Bear, Ltd. Burt unequivocally refused to guarantee the note and limited his personal liability to the original promissory note which was his obligation as a limited partner to the partnership. The agreement was clear that the promissory note was collateral and created no new obligation between the bank and Burt. Under these circumstances, no obligation arose either implied in fact or in law from Burt to the bank.

The bank also argued at trial and now on appeal that Burt's execution and delivery of the "duplicate original" promissory note induced the bank to rely upon this note as "good" collateral and he is equitably estopped from avoiding the consequences of his actions.

Equitable estoppel has been defined as the effect of the voluntary conduct of a party whereby he is precluded from asserting rights which might otherwise have existed against another party who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse. (*Willowbrook Development Corp. v. Pollution Control Board* (1981), 92 Ill. App. 3d 1074, 1078, 416 N.E.2d 385; *Shockley v. Ryder Truck Rental, Inc.* (1979), 74 Ill. App. 3d 89, 94, 392 N.E.2d 675.) As stated in *Stewart v. O'Bryan* (1977), 50 Ill. App. 3d 108, 365 N.E.2d 1019, six elements must be presented for the doctrine of equitable estoppel to be applicable:

> "(1) Words or conduct by the party against whom the estoppel is alleged constituting either a misrepresentation or concealment of material facts; (2) knowledge on the part of the party against

whom the estoppel is alleged that representations made were untrue; (3) the party claiming the benefit of an estoppel must have not known the representations to be false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting the estoppel; (5) the party seeking the benefit of the estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of the estoppel must be in a position of prejudice if the party against whom the estoppel is alleged is permitted to deny the truth of the representations made." (50 Ill. App. 3d 108, 110, 365 N.E.2d 1019.)

A fraudulent intent is not always necessary to estoppel. Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from defendant's conduct. (*Cessna v. Montgomery* (1976), 63 Ill. 2d 71, 86, 344 N.E.2d 447.) Although an estoppel may arise from silence as well as words, silence will not create an estoppel unless there is a positive duty to speak. (*Town & Country Bank v. James M. Canfield Contracting Co.* (1977), 55 Ill. App. 3d 91, 370 N.E.2d 630.) "A party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." *Vail v. Northwestern Mutual Life Insurance Co.* (1901), 192 Ill. 567, 570, 61 N.E. 651.

The bank relies principally on *Shockley v. Ryder Truck Rental, Inc.* (1979), 74 Ill. App. 3d 89, 392 N.E.2d 675, wherein the court states that when a person apparently adopts a position which reasonably leads someone into detrimental reliance, intention is not necessary for estoppel to arise, if to hold otherwise would have an unjust effect. (74 Ill. App. 3d 89, 95, 392 N.E.2d 675.) However, the court went on to note that questions of fact are presented concerning whether the person sought to be estopped is claiming the benefit of his alleged wrongful conduct and whether that person could reasonably have foreseen that his conduct might mislead the party claiming estoppel into detrimental reliance.

The intention of the parties to the loan, the bank and Little Bear, Ltd., was to make the loan to Little Bear, Ltd., upon execution of a promissory note signed by Janson for Little Bear, Ltd., execution of an assignment by Little Bear, Ltd., of the original promissory note from Burt, and delivery of the original note to the bank as collateral. However, only Janson and Thorson met to finalize the details, and when Thorson expected the original promissory note and instead was tendered a photocopy by Janson, Thorson told him to get the original note. When Janson returned the next day with the "duplicate original" note, Thorson accepted it and

was told by Janson that the original was in Colorado. Burt had not met or conversed with Thorson since the original meeting at the bank.

■■ From these circumstances, we conclude that the bank acted on its own in accepting the "duplicate original" note instead of the agreed-upon delivery of the original note. While it is obvious that Janson was not telling the truth about the location of the original note, there is no proof that Burt was aware of this fact. Thus it was the bank that departed from its own requirement that it receive the original note. Burt's execution of a "duplicate original" note which was a photocopy of the original note except for the new signature and the words "DUPLICATE ORIGINAL," is insufficient to cause reliance of the bank on that note since it knew that Burt would not incur any further liability beyond the original note. In short, the bank accepted the "duplicate original" note in deviation of the original intention of the parties and cannot now try to estop Burt from asserting defenses when all the parties agree that Burt expressly refused to incur any further liability.

The bank also raises an estoppel question based on the premise that as between two innocent parties, the less blameful should prevail. (See *Montgomery Ward & Co. v. Peter J. McBreen & Associates* (1976), 40 Ill. App. 3d 69, 72, 351 N.E.2d 324.) The bank relies on *Richard's Lumber & Supply Co. v. National Bank* (1975), 32 Ill. App. 3d 835, 336 N.E.2d 820, in support of this proposition. In this case a bank had been given a mortgage trust deed as collateral for a loan. In loaning the money, the bank relied on several waivers of mechanics liens upon the subject property which had apparently been duly signed by the president of Richard's Lumber & Supply Co., holder of the liens. The lumber company contended that although the waivers were signed, they had been signed in blank and stolen from the president's office by the mortgagor, who was an employee of the lumber company. The trial court determined that such defense would not equitably overcome the position of the bank as an innocent third party which had loaned money in reliance on the properly signed waivers. The bank's mortgage therefore had priority over the liens, which it otherwise would not have had. The court quoted *Decatur Lumber & Manufacturing Co. v. Crail* (1932), 350 Ill. 319, 325, 183 N.E. 228:

> " '* * * where one of two innocent persons must suffer by the fraud of a third person, the loss must fall upon him who by his conduct put it in the power of such third person to cause the injury.' " (32 Ill. App. 3d 835, 837.)

The court's analysis concluded:

> "Under the circumstances, where the bank paid money in reliance on what appeared to be regularly executed waivers of lien, in the normal course of business, and where the lienors seek to

show the invalidity of the waivers on grounds of fraud, not involving the bank, there is a basic presumption of innocence of the bank, absent some indication from the facts that the bank in fact knew about or should have known about Witbrod's [the mortgagor] fraudulent conduct." 32 Ill. App. 3d 835, 838.

■■ Under the circumstances in the present case, the bank did not loan money on what appeared to be a regularly executed note. Charles Thorson saw the words "DUPLICATE ORIGINAL" typed across the face of the note. Upon inquiring about the significance of that notation, Janson told him the original note was in Colorado. Thorson did not check further with Burt about this note or disbursement of the loan. Thorson took the "duplicate original" note anyway and disbursed the funds. Thorson knew Burt had refused to incur any additional liability beyond the original note. Burt's conduct did not place Janson in a position to cause any injury to the bank, as did the endorsement in blank of the lien waivers in *Richard's Lumber & Supply Co.* Burt told Janson of specific limitations on the making of the duplicate original. He, in good faith, believed those limitations would be followed. No such limitations existed in *Richard's Lumber & Supply Co.* Here, also, the bank itself was alerted to the absence of the original note. Despite this, the bank accepted the "duplicate original" note, proceeded with the loan, and disbursed the funds without having the original note in its possession. The bank was in a position to refuse to accept the "duplicate original" note which varied from the original intention of the parties. It was testified that the acceptance of a duplicate original note as collateral was a deviation from standard banking practices. In fact, both Bradshaw and Thorson had never seen, in their experience, a "duplicate original" note used as collateral for a loan. We do not find Burt's conduct to be any more blameful under these facts than the bank's. Accordingly, Burt is not to be estopped from asserting his defenses.

The bank also appeals from the trial court's specific findings that Burt had put a clear limitation on his liability on the capital note and that there was no intention expressed to treat the "duplicate original" note as a guarantee. From our review of the evidence we do not believe that these findings were against the manifest weight of the evidence. It is well established that the trial judge is in a superior position to determine the witnesses' credibility and to weigh the evidence, and a verdict based upon conflicting evidence should not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *Career Opportunities Inc. v. Grant, Wright & Baker, Inc.* (1980), 91 Ill. App. 3d 984, 987, 415 N.E.2d 463.

Finally, we need not review the bank's contention on appeal that Burt's affirmative defenses at trial of failure of consideration for the

pledged note and collateral estoppel based upon a judgment in another case are not available to Burt as the trial court did not base its judgment upon either of these affirmative defenses which were in the pleadings.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

LINDBERG and NASH, JJ., concur.