**David Alan NUTTY, Plaintiff,**

v.

**JEWISH HOSPITAL, Defendant.**

**Civ. No. 80–3058.**

United States District Court,
S.D. Illinois,
East St. Louis Division.

Sept. 23, 1983.

Bruce Cook, Cook, Sheflin & Chatham, Belleville, Ill., for plaintiff.

Parks G. Carpenter, Peter F. Spataro, Moser, Marsalek, Cleary, Jaeckel & Keaney, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

This matter is before the Court pursuant to a non-jury trial on the issue of whether defendant Jewish Hospital should be estopped from raising the statute of limitations as a defense. In an Order dated June 3, 1983, the Court held that plaintiff's case against the hospital was barred by the Illinois Statute of Limitations. 564 F.Supp. 1459. However, the Court declined to dismiss plaintiff's case because he alleged sufficient facts to invoke the doctrine of equitable estoppel.

For purposes of this limited hearing, the Court accepted as true plaintiff's allegations of medical malpractice. Although plaintiff has alleged numerous theories of negligence in his complaint, it appears now that plaintiff is relying primarily, if not solely, on the theory that there was unwarranted delay from the time plaintiff began to experience neurological distress to actual medical treatment. Specifically, agents of Jewish Hospital were allegedly negligent in failing to notify a doctor that plaintiff was losing sensation in his legs. Plaintiff alleges that due to this negligence over four hours elapsed from the time plaintiff began to suffer a deficit to the time his doctor was notified. Plaintiff alleges if it was not for this delay, plaintiff would not be paralyzed.

The narrow issue before the Court is whether plaintiff reasonably relied on defendant's conduct or representations in forebearing suit. *Bomba v. W.L. Belvidere, Inc.,* 579 F.2d 1067, 1971 (7th Cir.1978). On July 19 and 20, 1983, the Court heard evidence and oral argument, and the Court now reaches the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On June 8, 1978, plaintiff suffered severe injuries while working at a quarry in Ava, Illinois. Plaintiff was taken to a hos-

pital in Murphysboro, Illinois, and doctors there recommended that he be sent to Jewish Hospital in St. Louis, Missouri.

2. Plaintiff's multiple injuries included an unstable fracture in his lower back in the L2–L3 region. When plaintiff was admitted to Jewish Hospital on June 8, 1978, he could move his legs, however, he did experience a tingling sensation. Dr. Lander, who was in charge of plaintiff's case, advised plaintiff's parents that paralysis could result from plaintiff's condition.

3. In the early morning hours of June 10, 1978, plaintiff began to experience a neurological deficit, and he began to lose sensation in his legs and feel increased numbness. At approximately 4:00 o'clock a.m., he complained to Nurse Diane Brennan. Barbara Nutty, plaintiff's mother, became aware of the change in her son's condition between 4:00 and 5:00 o'clock a.m., and she also notified Nurse Brennan. Nurse Brennan told Mrs. Nutty that Alan's doctors were aware of his condition and on the way.

4. Nurse Brennan did talk by phone to Dr. Meltzer, a resident at Jewish Hospital. However, Nurse Brennan did not tell the doctor about plaintiff's complaints of paralysis. She attributed plaintiff's complaints to a hysterical reaction produced when she suctioned his lungs to help him breathe.

5. At approximately 5:00 o'clock a.m., Mrs. Nutty called her husband, Frank Nutty. He arrived at the hospital at approximately 5:30 o'clock a.m., and after he saw his son, he asked Nurse Brennan what was going on. He was assured that doctors were on the way.

6. Mr. and Mrs. Nutty interpreted the assurances they received from Nurse Brennan to mean plaintiff's deteriorating neurological status was being dealt with, and that doctors who could stop and reverse the deterioration were aware of the situation and were on the way. Specifically, Mr. and Mrs. Nutty thought Dr. Lander was notified at least by 5:30 o'clock a.m. In fact, Mr. and Mrs. Nutty were misled because Dr. Lander was not called until 8:15 o'clock a.m.

7. At about 7:00 o'clock a.m., Dr. Kathleen James, an intern employed by Jewish Hospital, saw plaintiff while making her rounds. She noticed a definite deterioration in plaintiff's neurological status. She did not talk to plaintiff or his parents directly about his condition. Further, at no time did Dr. James tell plaintiff or his parents about the delay.

8. Dr. Lander arrived at about 9:00 o'clock a.m. He told Mr. Nutty that they would operate immediately, but he later said surgery would have to wait until Dr. Hawkins, a neurosurgeon, arrived.

9. At 1:45 o'clock p.m., surgery was performed on plaintiff to relieve the pressure on his spinal cord. After the surgery, Mr. Nutty asked Dr. Tatkow whether the delay had any effect on his son's condition. Dr. Tatkow assured him the delay was inconsequential.

10. Alan Nutty, although suffering from various injuries, was aware that there was a long wait from the time he complained of loss of sensation in his legs until surgery. Nonetheless, he did not suspect any malpractice, and that he believed everything was being done as quickly as possible because he was told that surgery is performed as quickly as possible when a patient is in serious condition.

11. Mrs. Nutty talked with Dr. Franz Steinberg, Director of the Department of Rehabilitation Medicine at Jewish Hospital, about her son's condition. He assured her that everything was done that could have been done for her son.

12. Plaintiff was released from Jewish Hospital in December of 1978. Plaintiff and his parents were very impressed with the hospital and its staff. Moreover, they were all very proud of the doctors who treated plaintiff. They did not suspect that there was a delay in calling Dr. Lander on June 10, 1978. It was not until December of 1981, when Dr. Lander was deposed in connection with another lawsuit, that plaintiff or his family suspected plaintiff did not receive the best of care while at Jewish Hospital.

### CONCLUSIONS

Plaintiff argues that three separate acts or omissions by defendant satisfy the element of equitable estoppel. First, he argues that his parents reasonably relied on the statements of Nurse Brennan that doctors were aware of their son's deteriorating neurological condition and on the way. Second, plaintiff argues Dr. James had an affirmative duty to disclose to plaintiff that there was an inordinate delay from his complaints of paralysis to the time Dr. Lander was notified. Finally, plaintiff argues he reasonably relied on Dr. Steinberg's representations that he received adequate care at Jewish Hospital.

### I

■ As stated above, to successfully invoke equitable estoppel, plaintiff must establish that he reasonably relied on defendant's conduct or representations in forebearing suit. *Bomba v. W.L. Belvidere, Inc., supra; Witherell v. Weimer,* 85 Ill.2d 146, 52 Ill.Dec. 6, 13, 421 N.E.2d 869, 876 (1981). The lynchpin of the analysis often is whether a plaintiff's reliance was in fact reasonable. "A party claiming estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, but then charge his ignorance to others." *Gary-Wheaton Bank v. Burt,* 104 Ill.App.3d 767, 60 Ill.Dec. 518, 527, 433 N.E.2d 315, 324 (1982) *citing Vail v. Northwestern Mutual Life Insurance Co.,* 192 Ill. 567, 61 N.E. 651 (1901).

Defendant argues vigorously that equitable estoppel is not implicated unless plaintiff proves defendant intended to deceive plaintiff through its conduct or representations. If this were a correct statement of the law in Illinois, the task of the Court in resolving this issue would be simple indeed, because there was no evidence that agents of Jewish Hospital intended to cause plaintiff to neglect his claim. In *Witherell, supra,* however the court found that it is not necessary that defendant intended by its conduct or representations to induce delay. The court adopted the statement of the Pennsylvania Supreme Court in *Nesbitt v.*

*Erie Coach Co.,* 416 Pa. 89, 204 A.2d 473, 477 (1964) that it is "not the intention of the party estopped but the natural effect upon the other party which gives vitality to an estoppel." *Witherell v. Weimer, supra,* at 875–76.

Furthermore, the Court's analysis of the issue of estoppel varies depending on the nature of the relationship between the parties. For instance, when plaintiff and defendant are in a fiduciary relationship, mere silence can trigger estoppel.

> It is the prevailing rule that as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person, occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act, . . . . "

*Chicago Park Dist. v. Kenroy, Inc.,* 78 Ill.2d 555, 37 Ill.Dec. 291, 402 N.E.2d 181 (1980). Moreover, the existence of a fiduciary or confidential relationship alters the burden on plaintiff to establish that his reliance on defendant was reasonable. In *Sanchez v. South Hoover Hospital,* 18 Cal.3d 93, 132 Cal.Rptr. 657, 660, 553 P.2d 1129 (1976), the California Supreme Court held that facts which would ordinarily require investigation may not excite suspicion when the parties have a fiduciary relationship and thus, a diminished degree of diligence is required of the injured person. *See Stafford v. Schultz,* 42 Cal.2d 767, 270 P.2d 1, 7, 8 (1954).

While physicians clearly have a fiduciary relationship with their patients, the relationship between a hospital and a patient is more difficult to categorize. On the one hand, a patient's relationship with nurses, residents, and interns who are entrusted with the patient's care is something more than an arm's length transaction between strangers. On the other hand, hospital personnel are distinguishable from the patient's doctor, who as "captain" of the medi-

cal team, is ultimately responsible for the patient's welfare.

Plaintiff cites *Emmett v. Eastern Dispensary and Casualty Hospital,* 396 F.2d 931, 935 (D.C.Cir.1967) for the proposition that hospitals, like doctors, have a fiduciary relationship with a patient. *Emmett* cannot be relied on for so broad a holding. *Emmett* involved the duty of a hospital to disgorge a decedent's medical records when requested by a representative of decedent's estate. The Court agrees that the duty of a hospital to present medical records upon request is indistinguishable from a doctor's duty to reveal similar records. While the duty of a hospital to reveal medical records is analogous to a duty of a doctor to reveal his records, the analogy breaks down when one compares the doctor-patient relationship with the nurse-patient or intern-patient relationship. Indeed, plaintiff testified by way of deposition that his reliance on Dr. Lander was very different from his reliance on the remainder of the medical team.

Nonetheless, the Court finds that the hospital-patient relationship to be very relevant to the question of estoppel. The superiority of knowledge of the hospital staff, and the confidence and trust which patients must place in nurses and interns, are all factors to be considered when determining whether plaintiff's reliance on representations by Nurse Brennan and the other hospital personnel was reasonable.

## II

■ Turning to the evidence, the Court finds that in light of the principles set out above, defendant should be estopped by the representations of Nurse Brennan from raising the statute of limitations as a defense. First, on two different occasions, Nurse Brennan assured either Mr. or Mrs. Nutty that Alan's doctors were aware of his developing paralysis and that they were "on the way." Although these assurances were not intended to deceive plaintiff or his parents, the natural effect on them was the belief that everything was under control when in fact Alan's paralysis was being ignored. Plaintiff and his parents all testi-

fied that they did not suspect Nurse Brennan was in any way negligent on the morning in question. In short, they relied on her representation that she had notified a doctor.

Second, plaintiff's reliance on these representations was reasonable under all the circumstances of this case. Nurse Brennan's responsibility when plaintiff complained of paralysis was very limited. Plaintiff and his parents could only expect her to notify his doctors and keep him as comfortable as possible. She assured them, in effect, that she had done her job. Plaintiff had no reason to suspect otherwise.

Defendant argues that plaintiff's reliance was unreasonable because plaintiff and his parents were fully aware of all the events which transpired during the morning of June 10, 1978. Specifically, they were aware of the delay, and they knew when doctors examined and did not examine Alan. Defendant argues that from these facts plaintiff should have realized Nurse Brennan had not called the doctors. It is undisputed that plaintiff and his parents were aware of the delay, however, they had no reason to suspect Nurse Brennan was the responsible party. Once Alan's doctors were aware of his situation, any delay would be attributable to their negligence or their judgment that immediate action was unwarranted or impossible. Mr. Nutty did in fact question Dr. Tatkow about the delay and Dr. Tatkow did not disclaim responsibility for the delay but rather assured him the delay was inconsequential. Thus, plaintiff and his parents had no indication that Nurse Brennan did not call the doctor.

Plaintiff's claim of estoppel is buttressed by the fact that the representations in question were made in the context of the nurse-patient relationship: While this relationship is not a fiduciary one requiring the duty to disclose, plaintiff's lack of suspicion becomes even more reasonable in this context. Furthermore, plaintiff's argument is aided by considering the natural course of events if Nurse Brennan had told plaintiff's parents the whole truth; that she was not going to bother the doctors with plaintiff's

complaint of paralysis because she thought the complaints were a result of an unpleasant suctioning procedure she had just completed. It would have become obvious to plaintiff and his parents that Nurse Brennan's "diagnosis" was in error as the morning progressed, and her responsibility for a significant portion of the delay would have been self-evident.

Finally, defendant argues that estoppel is inappropriate because plaintiff could have discovered the representations of Nurse Brennan were false through the exercise of ordinary diligence. Specifically, relying on *Greenock v. Rush Presbyterian St. Lukes Medical Center,* 65 Ill.App. 266, 22 Ill.Dec. 1, 382 N.E.2d 321 (1978), defendant argues that because Nurse Brennan's alleged negligence is evident from the medical records, plaintiff's failure to obtain the records precludes him from invoking estoppel. In *Greenock,* plaintiff sued the defendant hospital, after the statute of limitations had run, for the wrongful death of his wife who died during an operation. The court declined to entertain plaintiff's allegations of fraudulent concealment because plaintiff could have obtained the hospital records within the statutory period and discovered the cause of death.

The plaintiff in *Greenock* is clearly distinguishable from plaintiff in this case. In *Greenock,* plaintiff had every reason to suspect that the doctors and nurses would not be perfectly candid when describing the cause of his wife's death because he was a non-patient who represented a potential lawsuit. The representations made to Mr. and Mrs. Nutty, however, were made very naturally in the ordinary course of providing care, and there was no reason to suspect Nurse Brennan did not call the doctors as she claimed. Moreover, this is not a case where there is lingering evidence, such as pain, that indicates medical personnel were possibly negligent in their treatment or diagnosis. The hospital's alleged negligence involves a phone call that was not made. Plaintiff had no reason to think twice about Nurse Brennan until November, 1981, when Dr. Lander was deposed in connection with another case and he hinted that perhaps

plaintiff did not receive ideal care while at Jewish Hospital.

Accordingly, the Court finds that defendant Jewish Hospital is hereby estopped from raising the statute of limitations as a defense.

IT IS SO ORDERED.