ALFRED A. OBERMAIER *et al.*, Plaintiffs-Appellees, v. NORMAN OBERMAIER, Indiv. and as Trustee of the Trust under the Will of Emma B. Obermaier, Deceased, for the benefit of Alfred A. Obermaier, Defendant-Appellant.

First District (3rd Division) No. 83—830

Opinion filed May 10, 1984.—Modified on denial of rehearing December 5, 1984.

Stephen C. Sandels, Walter M. Jones, and John R. Doyle, all of Chicago (McDermott, Will & Emory, of counsel), for appellant.

Mark A. Lies III, Peter C. Woodford, and Jerome F. Buch, all of Chicago (Seyfarth, Shaw, Fairweather & Geraldson, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs brought this action against defendant Norman Obermaier seeking to recover damages for breach of fiduciary duties and fraud in the sale of stock. After a trial without a jury, the trial court entered judgment for plaintiffs and awarded $1.1 million in compensatory damages, $250,000 in punitive damages, and $241,057 in prejudgment interest at the statutory rate. Defendant appeals, and plaintiffs have cross-appealed, urging that the damages are inadequate.

In the late 1930's, Alfred and Norman, who are brothers, began working for Alnor Instrument Company, a company owned by their father. Alfred contributed engineering skills and was responsible for several of Alnor's patents, while Norman contributed management skills. The parties' father died in 1958. Their mother, Emma, then controlled 230 shares of stock, while Alfred and Norman each had a one-half interest in the remaining 5,259 shares. Harris Trust & Savings Bank is a nominal plaintiff as the successor trustee of the Alfred A. Obermaier Trust No. 2, which held 870 shares in Alnor for Alfred's benefit at the time of the sale of stock at issue here.

The brothers did not get along, and Alfred's drinking problem following his father's death prevented him from contributing to Alnor as he had in the past. In order to ensure that Norman would control Alnor, in 1971 Emma added a codicil to her will. When she died in 1973, Norman received 115 shares outright and was appointed trustee of the other 115 shares under a trust for Alfred's benefit. After Norman had voting control, Alfred became less involved with Alnor but did keep apprised of its financial condition. In 1976, the brothers considered selling Alnor and retiring.

Norman and his attorney dealt with all of the prospective buyers. In August 1977, Podd-Bell Corporation expressed interest in buying Alnor at Norman's asking price of $8 million. Norman also offered to sell Alnor for $7.5 million if Podd-Bell would allow him to purchase back oil and gas leases for $39,000. At the time, Norman valued the leases at $500,000. When Podd-Bell refused this alternative, but offered $8 million, Norman demanded a consulting contract for 10 years at $50,000 a year. Although Alfred's attorney had asked to be apprised of any developments in the sale of Alnor, Norman did not tell him of the negotiations between Podd-Bell and himself.

Podd-Bell signed a letter of intent offering $8 million and a consulting contract for defendant. When it became clear, however, that Podd-Bell was having trouble raising the money, a second letter of intent with an expiration date of March 31, 1978, was signed. Both brothers signed the letter, Alfred relying on Norman's statement that the price was fair. Alfred's attorney never saw the letter of intent.

In an attempt to find financing, Podd-Bell contacted a Swedish corporation, Studsvik Energiteknik AB, which agreed to invest in Alnor. The proposed agreement called for installment payments to the brothers. Norman, however, was becoming displeased with Podd-Bell and the persons it chose to run Alnor. He was concerned that the installment payments would not be made. When Podd-Bell did not meet the March 31 deadline, Norman told Alfred about his concerns and, on April 3, 1978, refused to grant an extension.

When the Podd-Bell letter expired, Norman discussed buying out Alfred's stock. Alfred countered that he would buy out Norman, but Norman told him that no one at Alnor would work for him. Alfred then agreed to Norman's offer of $4 million for Alfred's interest. Norman also told Alfred, as he had told Podd-Bell earlier that day, that he would not look for another buyer for at least a year.

Prior to the expiration of the Podd-Bell offer, Norman and Albert Aspito, Alnor's executive vice-president, were in touch with Dr. Dezso Ladanyi, president of Alnor's subsidiary, Noral. Ladanyi indicated his interest in buying Alnor, and prior to April 3, he began organizing a group of investors. Norman initially indicated that he was interested in selling 49% of his stock for $1.96 million.

According to Ladanyi's testimony and his diary notations, on the same day on which Norman offered to buy out Alfred, Aspito contacted Ladanyi. Aspito told him Alnor was available for $8 million, and then he said Norman only wanted to sell 49% of the company, with Aspito getting part of the equity. Norman also told Ladanyi that Norman wanted $5 million for his interest in Alnor but that the deal

was "on hold" because Alfred might find out and retaliate. Norman denied discussing anything more than the sale of 49% of his stock, while Aspito had no recollections of the conversations with Ladanyi. Ladanyi was never successful in finding investors and never made an offer to buy Alnor.

From April 3 to May 8, 1978, attorneys for the brothers drafted and revised the stock purchase agreement. Norman insisted that the agreement contain a specific provision releasing him from any liability for any sale of Alnor in "the near or distant future." A final draft of the agreement was approved and the closing was set for May 8. Alfred contracted for a private appraisal of his shares, although the appraiser did not tour the plant and was unaware of the continued interest of several buyers. The shares were appraised for less than $4 million. Alfred, individually and as his own trustee, sold 2,629½ shares, and Norman, as trustee for Alfred under Emma's will, sold 115 shares to Alnor. Alfred received $800,000 immediately, the balance to be paid by Alnor in installments.

On May 8, prior to the closing, Norman received a call from Dr. Gerhard Kelter, Studsvik's attorney. Kelter arranged to meet Norman on May 10 to discuss the purchase of Alnor. Citing Alnor's increased sales potential, its improved profit picture and its new products, Norman asked for $6 million. By July 4, 1978, Norman and Studsvik agreed on the sale of Alnor. The sale was completed in December for $6.2 million, with Studsvik assuming the remaining payments to Alfred.

When Alfred learned of the sale and of Norman's additional profit, he brought this action alleging fraud and breach of fiduciary duties and seeking one-half of the additional consideration Norman received. After a trial, the trial court found clear evidence of fraud and a breach of Norman's fiduciary duty to disclose all information relevant to the stock sale.

■ We consider first Norman's contention that the trial court erred in finding constructive fraud and a breach of fiduciary duty. We believe, however, that the order of the court clearly indicates a finding of actual, not constructive, fraud.

Actual fraud is an intentional misrepresentation or intentional concealment, by one party, of a material fact which is relied on to the detriment of another party. (*Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 433 N.E.2d 315; *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 380 N.E.2d 1040.) The inaccurate or concealed information must be such that if the party had been aware of it he would have acted differently. (*Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d

190, 380 N.E.2d 1040.) Whether the party has reasonably relied on the information is a question for the trier of fact. (*Duhl v. Nash Realty, Inc.* (1981), 102 Ill. App. 3d 483, 429 N.E.2d 1267.) Constructive fraud does not require actual dishonesty or an intent to deceive. In a fiduciary relationship, where there is a breach of a legal or equitable duty, a presumption of fraud arises. *Zeilenga v. Stelle Industries, Inc.* (1977), 52 Ill. App. 3d 753, 367 N.E.2d 1347.

Norman contends that there was no misrepresentation or concealment of material facts. Relying on *Agatucci v. Corradi* (1945), 327 Ill. App. 153, 63 N.E.2d 630, and *James Blackstone Memorial Library Association v. Gulf, Mobile & Ohio R.R. Co.* (7th Cir. 1959), 264 F.2d 445, *cert. denied* (1959), 361 U.S. 815, 4 L. Ed. 2d 62, 80 S. Ct. 56, he asserts that a purchaser of stock has no duty to disclose the possibility of a future sale, and on the closing date neither Ladanyi nor Studsvik had made him a firm offer. The present case, however, is distinguished by the fact that Norman was also Alfred's trustee. Furthermore, Norman concealed other information in addition to that about potential buyers of Alnor.

A trustee owes the highest duty to his beneficiary to fully and completely disclose all material facts when he is dealing with the trust. (*Jackson v. Pillsbury* (1942), 380 Ill. 554, 44 N.E.2d 537.) The trial court found that Norman did not disclose the continued interest of at least three potential purchasers, his belief that Alnor's position warranted a higher price, and his attempt to retain Alnor's oil and gas leases. The materiality of an alleged misrepresentation is a question of fact, and the trial court's finding will not be disturbed unless it is against the manifest weight of the evidence. (*Kehl v. Abram* (1904), 210 Ill. 218, 71 N.E. 347.) The information here was material.

Norman also contends that Alfred did not reasonably rely on his statements because Alfred retained separate counsel and requested a private appraisal of his shares. Nevertheless, as the beneficiary under the trust created by his mother, Alfred had the right to rely on his trustee to act in good faith (*Sauvage v. Gallaway* (1946), 329 Ill. App. 38, 66 N.E.2d 740), and that he did so rely is supported by the record. Norman's duty to act in Alfred's best interest was not negated by Alfred's retaining separate counsel, especially in light of the fact that Norman actively prevented Alfred's attorney from getting the very information he needed to advise Alfred knowledgeably.

Finally, with respect to the issue of actual fraud, Norman contends that there was no evidence of his intent to defraud Alfred. We do not agree. From the time the brothers decided to sell Alnor, Norman was negotiating with prospective purchasers to arrange a better

deal for himself than for Alfred. When Podd-Bell made its initial offer, Norman attempted to negotiate a buy-back scheme for oil and gas leases at a substantial discount for himself. Norman also told both Alfred and Podd-Bell that he would not look for another buyer for about one year, while at the same time he was discussing a possible sale to Ladanyi. Norman also disregarded the requests of Alfred's attorney for information on prospective purchasers. The strong and appropriate language of the trial court that Norman "skinned" his brother and was engaged in "unconscionable conduct" lends itself to but one interpretation. The trial court properly found that Norman's conduct constituted actual fraud.

■ Norman next contends that the trial court's finding of a breach of fiduciary duty is against the manifest weight of the evidence because the court gave probative weight to inadmissible hearsay testimony from Ladanyi. Norman maintains that Ladanyi's testimony about his conversations with Aspito, who was relaying what Norman told him, is double hearsay. Norman, however, did not object to this testimony by Ladanyi at trial. Hearsay evidence, received without objection, may be given its natural probative weight. (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628.) Moreover, Norman's right to cross-examine the declarant was not denied, since both he and Aspito testified at trial. The trial court did not err in considering Ladanyi's testimony.

■ Norman also contends that the trial court's findings of the continuing interest of Podd-Bell in purchasing Alnor, Studsvik's desire to revive the deal, Ladanyi's negotiations at a $5 million price, Norman's belief that Alnor was worth more than $4 million, Dr. Kelter's May 8 phone call, and Norman's attempt to retain the oil and gas leases, were all on items which were immaterial or already known to Alfred. We find that such contention is without merit. As we have already stated, Norman's duty as a trustee was more extensive than that of a mere purchaser of stock, and any information he had should have been disclosed. Where the trustee deals with the trust for his own benefit, the presumption arises that the transaction was fraudulent. (*Curtis v. Fisher* (1950), 406 Ill. 102, 92 N.E.2d 327.) The burden of proving the fairness of the transaction, after a full and complete disclosure, is on the dominant party. (*Jackson v. Pillsbury* (1942), 380 Ill. 554, 44 N.E.2d 537.) Norman failed to show that the transaction was fair, and the court's findings were proper.

■ Norman also contends that the doctrine of estoppel precludes the findings of the trial court. Prior to filing this action, Alfred filed a claim in Federal court alleging a securities violation. The Federal

court dismissed that action with prejudice. In the Federal suit, Alfred alleged claims for common law fraud and breach of duties, but the court refused to consider them and dismissed them without prejudice. Indeed, in dismissing the State law claims without prejudice, the Federal court noted that conduct not prohibited by Federal securities laws may, nonetheless, amount to a breach of fiduciary duties. (See *Santa Fe Industries, Inc. v. Green* (1977), 430 U.S. 462, 51 L. Ed. 2d 480, 97 S. Ct. 1292.) We note also that the findings of the trial court are not inconsistent with any of the factual findings in the Federal dismissal of the securities violation claims. Alfred's cause of action is not barred by equitable estoppel.

■ Norman also maintains that the release contained in the stock purchase agreement bars Alfred's claims of fraud and breach of fiduciary duty. The release provides that Alfred understood that his brother might sell his interest in Alnor in the near or distant future and that Alfred specifically released and discharged Norman and Alnor from any claims which might arise out of the sale. Norman concedes that a contract procured through actual fraud is voidable at the option of the injured party. (*Ainsworth Corp. v. Cenco, Inc.* (1982), 107 Ill. App. 3d 435, 437 N.E.2d 817; *Shanle v. Moll* (1974), 25 Ill. App. 3d 113, 323 N.E.2d 148.) Nevertheless, Norman argues that the trial court made a finding of constructive fraud which will not vitiate the release provision. Having already determined that Norman's conduct constituted actual fraud and that the trial court so found, we reject this argument. The release provision is voided, and it does not bar Alfred's cause of action.

■ Norman finally challenges the award of damages. He contends that the trial court erred in extending his fiduciary duty to all of plaintiffs' stock, and that the court erred in awarding punitive damages.

Norman's attempt to restrict the award of the damages to the 115 shares held in trust is based on the notion that the sole basis for the trial court's findings is Norman's breach of fiduciary duty as trustee. With respect to the remaining shares, Norman maintains that he could deal with Alfred as though they were strangers.

A trustee may deal with his beneficiary, outside the scope of their relationship, as if no fiduciary relationship existed. The fiduciary relationship will not extend to nontrust property. (*Stoke v. Wheeler* (1945), 391 Ill. 429, 63 N.E.2d 492; G. Bogert, The Law of Trusts and Trustees sec. 544, at 427-28 (rev. 2d ed. 1978).) Yet where the trustee fraudulently misleads the other party, the transaction will be set aside. *Illinois Rockford Corp. v. Kulp* (1968), 41 Ill. 2d 215, 242

N.E.2d 228; *Wood v. MacLean Drug Co.* (1932), 266 Ill. App. 5.

Although Norman's breach of fiduciary duty extended only to the shares held in trust, his fraudulent conduct extended to the entire transaction. The contract was procured by fraud, and the trial court properly awarded Alfred one-half of the additional consideration Norman received from Studsvik.

■ Norman's argument that the award of punitive damages was improper is also without merit in light of our decision that Norman acted fraudulently. Punitive damages are appropriate to punish and deter conduct where defendant is guilty of fraud (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353), or an intentional breach of fiduciary duty (*Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821). Whether to award punitive damages is an issue for the sound discretion of the trial court, and its decision will not be set aside absent an abuse of discretion. (*Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14, 436 N.E.2d 1062.) There was no abuse of discretion here where the trial court found a flagrant breach of fiduciary responsibility and clear evidence of fraud.

■ In their cross-appeal, plaintiffs contend that the trial court erred in awarding prejudgment interest at the statutory, rather than market, rate because the lower rate does not fully compensate Alfred for the loss of the use of the money. Plaintiffs argue that Norman should not be allowed to profit as a result of his wrongdoing.

There is no right to recover prejudgment interest absent a statute or agreement. (*Kramlich v. Home Federal Savings & Loan Association* (1974), 26 Ill. App. 3d 430, 325 N.E.2d 657.) The right to such interest in Illinois is authorized by statute. (Ill. Rev. Stat. 1981, ch. 17, par. 6402.) Section 2 of "An Act in relation to *** interest ***" is applicable to judgments in fraud cases. (*Forrester v. State Bank* (1977), 52 Ill. App. 3d 34, 363 N.E.2d 904; *Pfeffer v. Farmers State Bank* (1931), 263 Ill. App. 360.) Plaintiffs urge the exercise of the equitable powers of the court to award a higher rate of interest (*Finley v. Finley* (1980), 81 Ill. 2d 317, 410 N.E.2d 12), and to compensate Alfred for his brother's unconscionable behavior. We find that the interest award in conjunction with the trial court's award of punitive damages adequately compensated Alfred.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RIZZI, P.J., and McGILLICUDDY, J., concur.