**In re James E. MAXWELL, Jr., Debtor, Charles J. Myler, Trustee.**

**CHART HOUSE, INC., Plaintiff,**

v.

**James E. MAXWELL, Jr., as Debtor and Charles J. Myler, as Trustee, Defendants.**

Nos. 83 C 5661 (82 B 6593) (82 A 3063).

United States District Court, N.D. Illinois, E.D.

May 2, 1984.

James A. Chatz, Michael R. Hassan, Lord Bissell & Brook, Chicago, Ill., for plaintiff.

Charles J. Myler, G. Alexander McTavish, Ruddy, Myler, Ruddy & Fabian, Aurora, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This is an appeal from a final order entered by the Bankruptcy Court denying plaintiff-appellant's motion to lift the automatic stay. The opinion of the bankruptcy judge is reported at 30 B.R. 982 (Bkrtcy.N.D.Ill.1983). This court has jurisdiction under 28 U.S.C. § 1334. It is plaintiff-appellant's position that the stay should be lifted because the sublease and franchise agreement between the parties, which covered a Burger King restaurant, had been terminated prior to the date appellee-defendant filed its Chapter 11 proceeding.

### I.

Section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a), permits the bankruptcy trustee to "assume or reject any executory contract or unexpired lease of the debtor." The Code further provides that:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee—

a) cures, or provides adequate assurance that the trustee will promptly cure, such default;

b) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

c) provides adequate assurance of further performance under such contract or lease.

11 U.S.C. § 365(b)(1).

In its April 12, 1983 reorganization plan, the trustee proposed to assume the sublease and franchise agreement. Chart House, Inc. promptly challenged this planned assumption, not on the ground that the trustee's assurances were inadequate under 11 U.S.C. § 365(b)(1) but, more fundamentally, because these agreements had been terminated prior to bankruptcy and thus were not subject to assumption under 11 U.S.C. § 365(a). *See* 2 Collier on Bankruptcy, ¶ 365.02 at 365–13 (15th ed. 1983).

Chart House and Maxwell had entered into a Burger King franchise agreement and a sublease at the end of December 1979. The franchise agreement permitted Maxwell to operate a Burger King restaurant at a specified location in Elgin, Illinois. The sublease covered those premises.

The provisions for termination of each of these agreements are of most importance to this case. The applicable language in the franchise agreement was as follows:

[XI.] B. Should [Maxwell] suffer an occurrence of any of the following events, [Chart House], *at its option* and without prejudice to any other rights or remedies provided for hereunder, or by law or equity, may terminate this license.

\* \* \* \* \* \*

(2) If franchisee defaults in the payment of royalties or advertising due hereunder or fails to submit profit and loss statements or other financial statements ... and fails to cure such defaults within thirty (30) days of written notification to cure same.

\* \* \* \* \* \*

(6) Upon notification of any default [Maxwell] agrees to promptly take such steps as may be required to cure the default and shall diligently pursue such curative measures as may be required and in the event that thirty (30) days' time is insufficient then [Maxwell] shall have as much time as may be reasonably required to cure same.

(Franchise Agreement, pp. 36a–37a.) (Emphasis added.) [1]

The sublease agreement provided in relevant part that:

If [Maxwell] shall fail to pay any installments of rent promptly on the day when the same shall become due and payable hereunder, and shall continue in default for a period of thirty (30) days after written notice thereof by [Chart House] ... [Chart House] may (a) declare the said term ended, and enter into said premises demised, or any part thereof, either with or without process of law, and expel [Maxwell] ... and so to repossess and enjoy said premises in [Chart House's] former estate.

(Sublease Agreement, p. 58a.)

Beginning in January of 1982, Maxwell failed to make the required advertising and royalty payments under the franchise agreement, as well as rental payments under the sublease. On April 6, 1982, Chart House sent a letter to Maxwell which called attention to these defaults, demanded that they be promptly cured, and promised that Chart House would resort to all of its legal remedies if Maxwell had not made payment or offered a satisfactory arrangement for payment within thirty days.

Maxwell neither cured the defaults nor offered a repayment arrangement. Conse-quently, on May 7, 1982, Chart House sent Maxwell a "Landlord's Five Days' Notice," which stated that unless Maxwell paid his rent within five days its "lease of said premises will be terminated forthwith." The notice further demanded immediate possession of the premises in the event of non-payment.

Maxwell did not pay his back rent or the other monies he owed Chart House, offer a repayment plan or relinquish possession of the restaurant. On May 14, 1982, Chart House brought an action in state court for possession of the restaurant and for judgment in the amount of the rent arrearage. This action was automatically stayed when Maxwell filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 21, 1982. Maxwell has continued to occupy and operate the restaurant since he declared bankruptcy. He has not cured the defaults but has on occasion made rental, royalty and advertising payments. His total indebtedness to Chart House has increased since he filed for bankruptcy.

## II.

Initially it is necessary to clarify the relationship between the franchise agreement and the sublease. The Bankruptcy Court viewed the sublease and the franchise agreement as both separate and interdependent, such that the agreements had to be terminated simultaneously in order to terminate either agreement. The court rejected Chart House's argument that the sending of the five-day notice to Maxwell and the filing of the forcible entry and detainer action in state court terminated the sublease and were together an affirmative act which terminated the franchise agreement. This approach was in error.

Certainly the two agreements are closely interdependent. The franchise agreement is limited to the specific premises which are the subject of the sublease. As Maxwell points out, termination of the sublease leaves the franchisee with a franchise that is worthless because there is no place to

---

**1.** Page numbers refer to the appendix to Chart House's brief.

operate it. In addition, the franchisee's obligation to make royalty and advertising payments is based upon the volume of its sales. Clearly, termination of the sublease means no sales by franchisee and thus renders the franchise agreement nugatory. In light of this interdependence, Maxwell argues that so long as the franchise agreement is in effect, the continuing existence of the sublease must be implied.

■ A better view is that because of the functional interdependence of these two contracts, termination of the sublease would also serve to terminate the franchise agreement, assuming that the pretermination procedures for the franchise agreement had been followed. Here Chart House followed these pretermination procedures. Its April 6 letter expressly advised Maxwell of the default under the franchise agreement. Maxwell neither cured the default nor made a diligent effort to do so within thirty days.

■ The bankruptcy judge was correct in deciding that the franchise agreement did not lapse automatically after these thirty days had elapsed. Rather, at the expiration of the thirty days Chart House could terminate the franchise agreement "at its option" (Franchise Agreement XI–B). Since the viability of the franchise agreement so obviously rested upon the continued existence of the sublease, Chart House's five-day notice of the impending termination of the sublease and its filing of suit in state court clearly advised Maxwell of Chart House's termination of the relationship between the parties.

■ It is instructive that the franchise agreement does not specify either the form or the content of the affirmative act necessary to exercise the option of terminating the agreement. Absent express contractual language, this court must adopt a reasonable construction of the termination provision in the franchise agreement. A requirement that Chart House could only terminate the sublease or the franchise agreement by simultaneous termination of both agreements, through the use of essentially duplicative notice procedures, exalts form over substance and ignores the inevitable negation of the franchise agreement occasioned by the termination of the sublease.

### III.

The issue thus becomes whether the sublease had been terminated before Maxwell filed for bankruptcy. If the sublease and the franchise agreement are interdependent and their termination procedures are interrelated, as outlined above, a finding that the sublease had been terminated will permit the lifting of the stay and prevent the trustee from assuming the agreements. Alternatively, if the two agreements are independently terminable, a finding that the sublease had been terminated will have the same effect. If the stay is lifted on the sublease alone and Chart House dispossesses Maxwell from the site, the franchise agreement will be of no use to the trustee for the reasons set out above.

The five-day notice which Chart House sent to Maxwell conformed to the statutory notice requirement:

> [A] landlord or his agent may, at any time after rent is due, demand payment thereof and notify the tenant, in writing, that unless payment is made within a time mentioned in such notice, not less than five days after service thereof, the lease will be terminated. *If the tenant shall not within the time mentioned in such notice, pay the rent due, the landlord may consider the lease ended* and sue for possession ....

Ill.Rev.Stat. ch. 80, § 8 (repealed as of July 1, 1982) (emphasis added).[2] When Maxwell made no response to this notice Chart House filed an action for possession and back rent in state court. The court had yet to enter judgment when the automatic stay was imposed. Because the bankruptcy judge believed that the sublease and the franchise agreement were interrelated and had to be terminated separately and simul-

---

**2.** Section 8 has been reenacted as Ill.Rev.Stat. ch. 110, § 9–209.

taneously, a finding that the sublease had been terminated would have been of no consequence to his decision not to lift the stay since he had decided that the franchise agreement remained in effect. He nevertheless held that in light of the absence of a judgment on Chart House's suit for forcible entry and detainer, the sublease had not been terminated for purposes of the bankruptcy proceeding. The judge cited with approval *Executive Square Office Building v. O'Connor & Associates, Inc.*, 19 B.R. 143 (Bkrtcy.M.D.Fla.1981). That court held that even leases terminated because of the tenant's default could be assumed by the bankruptcy trustee so long as the tenant had declared bankruptcy prior to the conclusion of statutorily-prescribed judicial eviction proceedings for a judgment of possession. *Id.* at 146–48.

■ Putting aside for a moment the effect of bankruptcy proceedings, it is clear under Illinois law that by sending the five-day notice and by filing a suit for possession, Chart House terminated the sublease. *See Woods v. Soucy*, 166 Ill. 407, 47 N.E. 67 (1897); *Elizondo v. Medina*, 100 Ill. App.3d 718, 56 Ill.Dec. 301, 303, 427 N.E.2d 381, 383 (1st Dist.1981); *Elizondo v. Perez*, 42 Ill.App.3d 313, 1 Ill.Dec. 112, 113, 356 N.E.2d 112, 113 (1st Dist.1976); *Westerman v. Gilmore*, 17 Ill.App.2d 455, 150 N.E.2d 660, 662–63 (3d Dist.1958); *Juhasz v. Haisan*, 337 Ill.App. 387, 85 N.E.2d 856 (1st Dist.1949); *Stromberg v. Western Telephone Co.*, 86 Ill.App. 270 (1899). Illinois courts have interpreted the clause in Ill.Rev.Stat. ch. 80, § 8, that "[i]f the tenant shall not within the time mentioned in such notice, pay the rent due, the landlord may consider the lease ended," to mean what it says. Leases in Illinois are terminated five days after the tenant's receipt of the statutory notice, provided the tenant does not cure the default. Upon the expiration of the five-day notice Maxwell lost its leasehold interest and became a tenant at sufferance. This occurred by May 14, 1982, well before Maxwell declared bankruptcy.

## IV.

■ It has been conclusively established that a bankruptcy court cannot resurrect a lease that has been terminated prior to the filing of bankruptcy. *In re Foxfire Inn of Stuart Florida Inc.*, 30 B.R. 30, 31–32 (Bkrtcy.S.D.Fla.1983); *Matter of DePoy*, 29 B.R. 466, 470 (Bkrtcy.N.D.Ind.1983); *In re Pagoda International, Inc.*, 26 B.R. 18, 21 (Bkrtcy.D.Md.1982); *In re Darwin*, 22 B.R. 259, 263 (Bkrtcy.E.D.N.Y.1982); *In re Fidelity American Mortgage Co.*, 19 B.R. 568, 573 (Bkrtcy.E.D.Pa.1982); *In re Victory Pipe Craftsmen, Inc.*, 8 B.R. 635, 637 (Bkrtcy.N.D.Ill.1981) (Eisen, J.); *Matter of R.R.S., Inc.*, 7 B.R. 870, 872–73 (Bkrtcy.M. D.Fla.1980); *In re Aries Enterprises, Ltd.*, 3 B.R. 472, 475–76 (Bkrtcy.D.C.1980). *See also Matter of Commodity Merchants, Inc.*, 538 F.2d 1260, 1262 (7th Cir.1976) (Section 70(b) of Bankruptcy Act); *cf. Matter of New Media Irjax, Inc.*, 19 B.R. 199, 200–01 (Bkrtcy.M.D.Fla.1982) (contract for goods). Leases terminated before bankruptcy are simply not assumable by the trustee.

The bankruptcy judge here, relying on *Executive Square, supra*, nevertheless treated the sublease as "property of the estate" subject to the automatic stay provisions of 11 U.S.C. § 362(a)(2) and (3) and assumable by the trustee. What was decisive for the judge, as for the court in *Executive Square*, was that the state court had not rendered judgment on Chart House's forcible entry and detainer action. The judge reasoned that since this proceeding offered Maxwell an opportunity to resort to equity in order to prevent termination of the lease, the lease had not expired for purposes of 11 U.S.C. § 365(a). This was in error.

■ In some states it is necessary for the landlord to obtain a judgment for possession in order to terminate a lease. *See e.g., In re Fontainebleau Hotel Corp.*, 515 F.2d 913 (5th Cir.1975) (Louisiana law). The bankruptcy judge offered no support for the proposition that Illinois is one of these states and this court has found no such support. In Illinois the statutory no-

tice procedure for terminating a lease and a forcible entry and detainer action are two distinct things. The former process ends the contractual relationship between the parties while the forcible entry and detainer action determines rights to possession of property. The bankruptcy court confused the two actions. *Executive Square* has been persuasively criticized on the same ground. *See In re Foxfire Inn of Stuart Florida, Inc., supra,* 30 B.R. at 31 (*Executive Square* "confused expiration or termination of lease with physical repossession of the leased premises"). The conclusion of the *Foxfire* court is equally applicable to this case:

> [T]he termination before bankruptcy of a lease pursuant to its terms and applicable State law results in its expiration, even if, as is the case here, the tenant remains in possession as a tenant at sufferance and the landlord has instituted but not yet concluded an eviction proceeding.

*Id.* at 31.

### V.

■ The property of a bankrupt's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S. § 541(a)(1). Courts have recognized that a debtor-tenant in possession does have a slight equitable interest under § 541 which is protected by the automatic stay. *See In re Darwin, supra,* 22 B.R. at 264–65; *Matter of Ruby's Florida,* 11 B.R. 171, 174–75 (Bkrtcy.M.D.Fla.1981); *In re GSVC Restaurant Corp.,* 10 B.R. 300, 302 (S.D.N.Y. 1980); *Matter of R.R.S. Inc., supra,* 7 B.R. at 872–83 (Bkrtcy.M.D.Fla.1980); *In re Andorra Meat Market, Inc.,* 7 B.R. 744, 745–46 (Bkrtcy.E.D.Pa.1980); *In re Mimi's of Atlanta, Inc.,* 5 B.R. 623, 627 (Bkrtcy.N.D. Ga.1980), *aff'd,* 11 B.R. 710 (D.C.N.D.Ga. 1981). The automatic stay gives only limited and temporary protection to this equitable interest. It will be lifted "for cause" in light of the debtor's inability to satisfy the requirements of 11 U.S.C. § 362(d), *In re Darwin, supra,* 22 B.R., at 264–65 (Bkrtcy. E.D.N.Y.1982), *In re Andorra Meat Mar-*

*ket, Inc., supra,* 7 B.R. at 746, or when the debtor can show no basis in equity for its continuance, *In re Foxfire Inn of Stuart Florida, Inc., supra,* 30 B.R. at 31–32.

■ As a debtor in possession, under a terminated lease which left it with only a tenancy at sufferance, Maxwell held this limited equitable interest which was protected by the automatic stay. It is not necessary to the disposition of this case to determine whether this interest has since lapsed or whether the automatic stay could have been lifted for cause under 11 U.S.C. § 362(d). Nevertheless, the court notes that for many months after he declared bankruptcy Maxwell apparently had made little or no effort to prepare a plan to pay off his debts and the amount of his debt to Chart House rose during the post-bankruptcy period.

■ What is crucial to the outcome of this case is that the presence of a limited equitable interest held by a debtor in possession has no bearing whatsoever on the issue of the assumability of the terminated lease. "The fact that the automatic stay gives limited and temporary protection to a holdover tenant-debtor, based solely on naked possession, does not mean that there is a viable executory contract which a debtor can assume under Sec. 363 of the Bankruptcy Code." *Matter of R.R.S. Inc., supra,* 7 B.R. at 872. *See also In re Foxfire Inn, supra; In re Darwin, supra; Matter of Ruby's Florida, supra; In re Andorra Meat Market, supra.* The use of the automatic stay to protect the limited interest of the tenant in possession has absolutely no bearing on the continued viability of the lease. "Once a lease is terminated prior to the intervention of bankruptcy, the landlord-tenant relationship is gone regardless of the protection of the right of possession." *Matter of R.R.S., supra,* 7 B.R. at 873. The separateness of the questions of the assumability of the lease and of the existence of a limited equitable interest based on the debtor's continued possession of property mirrors the differences between the process for terminating a lease

and the adjudication of possessory rights in a wrongful entry and detainer action.

■■■ The relevance of these principles to the case at hand is clear. Even if Maxwell has or had some protectible equitable interest stemming from his continued occupation of the restaurant premises, this interest is not sufficient to revive the terminated sublease. Because Chart House had properly terminated the sublease prior to Maxwell's declaration of bankruptcy, the sublease cannot be assumed by the trustee.

## VI.

The bankruptcy judge identified two equitable factors in support of his conclusion. The first is that Chart House waited for almost a year to assert that the sublease and the franchise agreements had been terminated and should thereby be estopped from making this argument. The second factor that he identified is that the two agreements are Maxwell's only assets and necessarily serve as the basis of the trustee's reorganization plan. On appeal, Maxwell advances a third equitable factor which it argues should prompt the court to find that the two agreements are assumable, namely, that Maxwell has paid and Chart House has accepted payments for Maxwell's continued operation of the restaurant since it declared bankruptcy.

■■■■ A landlord can waive termination of a lease by accepting the entire amount of the default. *Bismarck Hotel Co. v. Sutherland*, 92 Ill.App.3d 167, 47 Ill.Dec. 512, 516, 415 N.E.2d 517, 521 (1st Dist.1980). A partial cure of the default by the tenant, even before the expiration of the five-day notice, is not sufficient to avoid termination. *See Chapman v. Woolsey*, 4 Ill.App.2d 261, 124 N.E.2d 366, 368 (4th Dist.1955); *see also Elizondo v. Medina*, 100 Ill.App.3d 718, 56 Ill.Dec. 301, 302, 427 N.E.2d 381, 382 (1st Dist.1981); *Lehndorff U.S.A. Ltd. v. Cousins Club, Inc.*, 40 Ill.App.3d 875, 353 N.E.2d 171, 175–76 (1st Dist.1976). Here it is undisputed that Maxwell has never even partially cured the defaults which prompted Chart House's termination efforts. The payments which it did make to Chart House related to its continued occupation and operation of the restaurant. A landlord's acceptance of rent and other payments from a tenant at sufferance does not revive a terminated lease. It is well established that liability for rent continues so long as the tenant is in possession. *Jack Spring, Inc. v. Little*, 50 Ill.2d 351, 280 N.E.2d 208, 213 (1972). Consequently, by accepting these payments Chart House did not waive its termination of the sublease.

■■■ The bankruptcy judge's reliance on the importance of the sublease and the franchise agreement to the reorganization, is misplaced. Courts will not revive a terminated lease simply because of the lease's importance to the reorganization efforts. The statement of the court in *In re Fidelity Mortgage Company, supra*, is typical:

> The trustee contends, however, that we should consider the equities of the instant case—namely, that the property in question is important to the successful reorganization of the debtors—and thus deny the relief requested by the bank. Although such considerations are important in determining whether relief from the automatic stay should be granted, we conclude that they are irrelevant in determining whether the debtors have any interest in the property so that the protection of the automatic stay is available. Where the debtor has lost all interest in the property prior to the filing of a petition under the Code, we conclude that we should not rely on equitable considerations to revive the debtor's interest and to make the automatic stay provisions applicable.

19 B.R. at 573 (footnote omitted). *See also Matter of DePoy, supra*, 29 B.R. at 470; *In re Darwin, supra*, 22 B.R. at 263; *In re Victory Pipe Craftsmen, Inc., supra*, 8 B.R. at 637; *In re Chuck Wagon Bar-B-Que Inc.*, 7 B.R. 92, 95 (Bkrtcy.D.C.1980).

The bankruptcy judge's position that Chart House is equitably estopped from asserting that the agreements were terminated is perhaps the strongest of the three

factors identified. After its suit for possession of the premises was stayed, Chart House filed a complaint requesting the bankruptcy judge to compel assumption or rejection of the agreements in question. In apparent reliance upon Chart House's failure to assert that the agreements were terminated, the trustee devised a reorganization plan. It is only after the trustee filed his plan, which called for the sale of the business rather than its return to Chart House, that Chart House amended its complaint to assert that the agreements had been terminated prior to bankruptcy.

■ Equitable estoppel is defined as "the effect of voluntary conduct of a party whereby he is precluded from asserting rights which might otherwise have existed against another party who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse." *Gary-Wheaton Bank v. Burt,* 104 Ill.App.3d 767, 60 Ill.Dec. 518, 527, 433 N.E.2d 315, 324 (2d Dist.1982). As stated in *Stewart v. O'Bryan,* 50 Ill.App.3d 108, 8 Ill.Dec. 633, 365 N.E.2d 1019 (4th Dist. 1977), the six elements which must be present for the doctrine of equitable estoppel to apply are:

(1) words or conduct by the party against whom estoppel is alleged constituting either a misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom the estoppel is alleged that representations made were untrue; (3) the party claiming the benefit of the estoppel must have not known the representations to be false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting the estoppel; (5) the party seeking the benefit of the estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of the estoppel must be in a position of prejudice if the party against whom the estoppel is alleged is permitted

to deny the truth of the representations made.

8 Ill.Dec. at 634–35, *id.* at 1020–21.

■ Proof of fraudulent intent is not always necessary to invoke the estoppel doctrine. Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from the defendant's conduct. *Cessna v. Montgomery,* 63 Ill.2d 71, 86, 344 N.E.2d 447, 454 (1976). Whether estoppel should be applied in a given case must be determined from the particular circumstances. *Tyska by Tyska v. Board of Education,* 117 Ill.App.3d 917, 73 Ill.Dec. 209, 221, 453 N.E.2d 1344, 1356 (1st Dist.1983).

■ The elements necessary for equitable estoppel are not present here. There is no indication that Chart House's failure to actively pursue from the start its claim that the agreements were terminated, or any representations it made to the trustee, were designed to mislead or defraud Maxwell or the trustee. Nothing prevented the trustee from concluding—as was evident under Illinois law—that at a minimum the sublease had been validly terminated. More fundamentally, there is no proof that either Maxwell or the trustee were prejudiced by Chart House's delay in advancing its termination argument. Whether or not the agreements are assumed by the trustee appears to be of little concern to Maxwell. He will lose the restaurant in any event. The trustee admittedly will not see his reorganization plan come to fruition. This does not amount to legally-cognizable prejudice or detriment sufficient to invoke the estoppel doctrine, especially where other requisites are absent, or sufficient to resurrect the terminated agreements directly.

It appears from the limited record that Chart House has throughout these proceedings sought to regain possession of the restaurant. While its failure to promptly argue that the sublease and the franchise agreement had been terminated before bankruptcy, appears, in retrospect, to have been an unfortunate choice of legal tactics, no "fraudulent or unjust effect," *Cessna, supra,* 344 N.E.2d 447, at 454, has resulted

**240**

from its conduct. Consequently, in the absence of any other compelling equitable factors, Chart House is not precluded from asserting that the agreements were terminated.

### Conclusion

The franchise agreement and the sublease should have been read together such that the termination of the sublease would effectively terminate the franchise agreement. Chart House had terminated the sublease prior to Maxwell filing his Chapter 11 petition. No equitable factors justify resurrecting the sublease or precluding Chart House from arguing that the franchise agreement and sublease had been terminated. Consequently, the lease and the franchise agreement are not assumable by the trustee and the bankruptcy court should have lifted the automatic stay.

The decision of the bankruptcy court is reversed. This case is remanded to that court for further proceedings not inconsistent with this opinion.